IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:21-CR-260 |
| JAIRO AGUILERA SAGASTIZADO | |
| MELVIN CANALES SALDANA | |
| and | |
| MANILESTER ANDRADE RIVAS, | |
| *Defendants*. | |

**UNITED STATES' OMNIBUS RESPONSE IN OPPOSITION
TO DEFENDANTS' POST-VERDICT MOTIONS**

Melvin Canales, a/k/a Demente ("Canales"), Jairo Aguilera, a/k/a Psicólogo ("Aguilera"), and Manilester Andrade, a/k/a "Conejo" ("Andrade"), have filed motions seeking relief pursuant to Federal Rules of Criminal Procedure 29 and 33. ECF Nos. 895, 896, and 897, respectively. In so doing, they argue that the guilty verdicts returned by the jury in their trial ("Trial 1")[1] were not supported by sufficient evidence and that the interest of justice entitles them to new trials. But both claims fail; overwhelming evidence supported the defendants' convictions, and the defendants are incapable of showing that allowing the jury's carefully considered verdicts to stand would be manifestly unjust. Accordingly, the Court should deny the pending post-verdict motions across the board.

---

[1] Three of their co-conspirators, Marvin Menjivar, a/k/a Astuto ("Menjivar"), Cristian Arevalo, a/k/a Serio ("Arevalo"), and Carlos Turcios, a/k/a Oculto ("Turcios"), were tried separately in a subsequent trial ("Trial 2").

**ARGUMENT**

I. **The Defendants' Rule 29 Arguments Fail Because the Jury's Findings of Guilt as to Each Count and Special Sentencing Factor Charged in the Indictment Were Rational and Supported by the Evidence.**

Courts do not overturn juries' verdicts lightly. A reviewing court must not vacate a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted) (emphasis in original). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* The standard articulated by the Supreme Court in *Jackson* "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam) (quoting *Jackson*, 443 U.S. at 326).

Reviewing courts view the relevant trial evidence "in cumulative context, rather than in a piecemeal fashion." *United States v. Ath*, 951 F.3d 179, 185 (4th Cir. 2020). Under these standards, witness credibility may not be challenged. *United States v. Burgos,* 94 F.3d 849, 868 (4th Cir. 1996) (en banc) ("Determining credibility of witnesses and resolving conflicting testimony falls within the province of the factfinder, not the reviewing court."). In sum, "[a] defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden." *United States v. Lefsih*, 867 F.3d 459, 465 (4th Cir. 2017) (quoting *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997)).

**A.    Each Defendant's Conviction for Conspiring to Traffick At Least 500 Grams of Cocaine is Supported by Sufficient Evidence.**

Prior to charging the jury in Trial 2, the Court struck the special sentencing factor in Count Two of the Indictment, which alleged that the drug trafficking conspiracy of which co-conspirators Menjivar, Arevalo, and Turcios were members involved at least 500 grams of cocaine after the following exchange between the Court [C] and government counsel [GC]:

C:    Unless my hearing is beginning to fade – and I don't think it is – I did not hear a single argument from the government addressing the quantities of drugs in this case in your closing argument. Now, I know there's a lot of evidence, and I know that the focus has been on the murders, which make sense, because they are the most serious aspect of the case, but I always thought that with closing argument, the government normally puts forward its – you know, at least some argument as to each count that you're pursuing. Now, the drug conspiracy you've got, but there's not a scintilla of argument as to the quantities of drugs which the jury should find.

GC:    Your Honor, I believe the evidence is sufficient on that. We bought in this case, with the buys that were conducted – actually, less than half of which were presented, but were asked about – even with the buys that are in evidence, we have more than 500 grams. The testimony from multiple witnesses is that for years, there was a –

C:    Yeah, I agree with that, but it's as if you had abandoned that argument in the case. It's just not there in your closing argument. I sort of expected on your rebuttal you would at least take two minutes to mention it, but you didn't. So I'm going to strike from – at the very least I'm going to do this, I'm going to take the special finding from the verdict from as to the drug conspiracy count, because it was not argued to the jury. You've still got the conspiracy count. There's plenty of evidence that supports that, but in terms of the quantity. [T]he evidence in this case was – and this is unrefuted – that much – how much, we don't know, but many, many drug sales were not for the gang, they were people's own personal business – side business, so to speak, and I'm just not satisfied that we should take the jury's time up trying to figure out the quantities attributable to the defendants. So I'm removing that from the verdict form.

Tr. at 168-170 (1/30/24).

The defendants argue that the Court, as it did in Trial 2, should find that the United States failed to meet its burden as to Count Two's special sentencing factor because the government did

3

not address the quantity of cocaine alleged in Count Two during its closing argument in Trial 1 and because the evidence revealed the existence of multiple drug trafficking conspiracies. These arguments should be rejected.

      1.  <u>Evidence is Distinct from Argument</u>

The Court allowed the government a total of 45 minutes in a quadruple-homicide case to walk the jury through the elements of multiple federal racketeering statutes that incorporated Virginia murder law and federal drug trafficking laws, argue how the evidence presented in a week-long trial established each of those elements beyond a reasonable doubt, and respond to points raised in three different closing arguments. Because cooperating witnesses testified to a years-long, interstate cocaine trafficking operation corroborated by WhatsApp messages and more than 500 grams of cocaine that law enforcement had purchased from the co-conspirators, the government concentrated on the murder counts in its closing and rebuttal arguments.

None of the defendants cites to a single case or other source of authority that stands for the proposition that if the government does not summarize evidence in closing argument, the jury cannot consider that evidence or find that the government has met its burden of proof. Indeed, that cannot be the rule, given that the government has the option to waive closing argument. *See generally United States v. Smith*, 962 F.3d 755, 770-71 (4th Cir. 2020). As the Court instructed the jury, "statements and arguments of counsel are . . . not evidence in the case." Tr. at 145-146 (1/17/24). Further, the Court correctly instructed the jury that, if the jury found the defendants guilty of Count 2, it must determine whether the government had proven beyond a reasonable doubt that 500 grams or more of cocaine was reasonably foreseeable to each defendant. As the special verdict form confirms that, and the Trial 1 jury found that the government had proved the quantity of cocaine beyond a reasonable doubt, the verdict should stand.

2. Underline: The Evidence Established that the Defendants and Their Co-Conspirators Conspired to Distribute More than 500 Grams of Cocaine

 The indictment alleged that defendants Canales, Aguilera, and Andrade agreed to traffic in cocaine with other named and unnamed co-conspirators between 2016 and October 2020. The elements of a drug trafficking conspiracy under 21 U.S.C. § 846 are: (1) an agreement to traffic in drugs existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily joined the conspiracy. *United States v. Howard*, 773 F.3d 519, 525 (4th Cir. 2014). The conspiratorial agreement may be shown by circumstantial and inferential evidence, including evidence of the existence of a "tacit or mutual understanding" between the defendant and his accomplices. *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997); *Burgos*, 94 F.3d at 858.

Conspirators must pursue the same criminal objective, but a conspirator does not have to agree to commit or facilitate each and every part of the substantive offense, nor does he have to know the identity of all of his co-conspirators; conspirators may divide up work and assign different tasks to different members. *Ocasio v. United States*, 136 S. Ct. 1423, 1430 (2016); *United States v. Salinas*, 522 U.S. 52, 62 (1997); *Blumenthal v. United States*, 332 U.S. 539, 556 (1948); *United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001). Therefore, a person can be a drug conspirator by agreeing to store drugs at his house to support the conspiracy even if he does not have the specific intent to distribute drugs himself. *Ocasio*, 136 S. Ct. at 1430. A drug conspirator may also conduct his activities in a different state from the acts of his co-conspirators. *United States v. Stewart*, 256 F.3d 231, 250-51 (4th Cir. 2001). While a defendant's mere purchase or sale of a drug is not sufficient to prove a conspiracy under § 846, a buyer-seller relationship coupled with other factors such as continuing relationships, repeated transactions, and large quantities of drugs may establish a conspiracy. *Howard*, 773 F.3d at 525.

5

Here, the fact that gang members conducted some transactions to enrich themselves should not invalidate the Trial 1 jury's finding of Count Two's special sentencing factor because the evidence proved that they were all members of the same years-long cocaine trafficking conspiracy. A single conspiracy exists if the conspiracy has the same objective, the same goal, the same nature, the same geographic spread, the same results, and the same product. *United States v. Jeffers*, 570 F.3d 557, 567 (4th Cir. 2009); *Stewart*, 256 F.3d at 250-51. A single conspiracy may be shown by evidence that the defendants knew that the illegal efforts of others were needed to make their own dealings possible; or that each conspirator made a substantial commitment to the conspiracy by, for example, engaging in numerous criminal acts to support the objective of the conspiracy. *See e.g.*, *United States v. Johnson*, 54 F.3d 1150, 1154 (4th Cir. 1995). A single drug trafficking conspiracy is not converted into multiple conspiracies merely by a lapse in time, a change in membership, a loosely-knit structure, or a shift in its place of operation. *United States v. Tipton*, 90 F.3d 861, 882-83 (4th Cir. 1996); *United States v. Capers*, 61 F.3d 1100, 1107-08 (4th Cir. 1995). The arrests of some co-conspirators do not necessarily end a conspiracy. *United States v. Urrego-Linares*, 879 F.2d 1234, 1240 (4th Cir. 1989).

The evidence in this case established a single cocaine trafficking conspiracy. The evidence presented at trial showed that the defendants were members of the *Sitios Locos Salvatrucha* clique ("STLS") of the transnational criminal street gang known as *La Mara Salvatrucha* or MS-13. The evidence established that the enterprise to which the defendants belonged was fueled by the illicit proceeds of regular cocaine sales that began in 2016 after STLS received seed money from gang leadership in El Salvador. Tr. at 204 (1/9/24). While Mario Guevara, a/k/a Blue ("Guevara"), and Andrade sold the most cocaine for the gang, most STLS members also sold cocaine. *Id.* at 207-08.

The gang's cocaine trafficking operation was simple, organized, and effective. MS-13 members and associates would regularly travel to New York, where they would obtain cocaine (which they referred to as "product" or "semigloss") from Menjivar, the gang's leader in the United States. *Id.* at 203, 207-208; Tr. at 74-85 (1/11/24). They would transport the cocaine to Northern Virginia, where it would be divvied up among other MS-13 gang members for retail distribution. Tr. at 204-06, 208, 225-26, 228 (1/9/24); Gov't Ex. 25-27A; Tr. at 71, 81 (1/11/24); Tr. at 146 (1/10/24). Walter Rubio Lemus, a/k/a Casquillo ("Rubio"), also held additional cocaine provided by Menjivar that members could access in the event they ran out of cocaine to sell. Tr. at 74 (1/11/24); Tr. at 153-154 (1/10/24). Money generated from the sales would be collected and used to purchase more cocaine, weapons, or anything else STLS may have required. Tr. at 208-09 (1/9/24); Tr. at 145-46 (1/10/24). Aguilera served as the gang's "accountant" and told others how much money they owed the gang for cocaine. Tr. at 96 (1/11/24); Tr. at 154 (1/10/24). The evidence at trial proved that between January and August of 2020, law enforcement purchased more than 500 grams of cocaine from Canales, Andrade, Guevara, and other co-conspirators, utilizing confidential informants and an undercover detective.

The defendants' membership in MS-13 strongly implied that they were members of a single conspiracy that sold drugs to support itself. *See United States v. Fernandez*, 526 F. App'x 270, 279 (4th Cir. 2013) (MS-13's "mode of organization strongly indicate[d] that [a]pellants were all members of the same conspiracy"). The gang's tight control over its members' drug trafficking activities was confirmed by the regular provision of cocaine to its members, its records of product fronted to members, the collection of members' proceeds and the transfer of those proceeds to New York, and the disciplinary beatings given to those who came up short when the proceeds were due to the gang. *See supra*, *see also* Tr. at 157 (1/10/24).

Canales, citing no authority, argues that Guevara's claim to a confidential informant that the informant needed to choose whether he would purchase cocaine from him or from Canales and the informant's belief that members were making some money for themselves should invalidate the jury's finding. ECF 895 at 12. He is mistaken. In *Johnson*, more than 25 co-conspirators and participants were involved in a drug trafficking conspiracy that involved multiple sources of supply. *Johnson*, 54 F.3d at 1154. The appellants argued that they were competitors, not co-conspirators. *Id.* In affirming the appellants' convictions, the Fourth Circuit noted that:

> [w]hile the record demonstrates that the principals, including [a]ppellants, shared many sources, distributors, and customers, the fact that drug dealers "may sometimes, or even always, compete for supplies or customers in serving that market does not on that account alone disprove . . . the existence of a single conspiracy to achieve the overall results of their several efforts."

*Id.* at 1155 (quoting *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1995)). The record is devoid of any evidence that Canales, Andrade, Guevara, or any of the other co-conspirators were obtaining the cocaine they sold from any other source. Even if they had been, evidence that co-conspirators were engaged in a single drug trafficking conspiracy is neither negated nor rendered insufficient by the fact that they may have purchased narcotics from different sources at various times. *See Johnson*, 54 F.3d at 1155.

### B.    Canales' and Andrade's Convictions on Counts Nine and Ten Relating to the Murder of Eric Lanier Tate are Supported by Sufficient Evidence of Intent.

Canales' and Andrade's assertions that they lacked the necessary intent to kill Eric Tate fall flat, and a review of the record reveals that substantial evidence was presented to support both Canales' and Andrade's convictions for conspiracy to commit murder in aid of racketeering activity and Canales' conviction for aiding and abetting the murder of Eric Tate in aid of racketeering activity in Counts Nine and Ten. ECF 895 at 8-10; ECF 897 at 1.

8

To establish that a defendant committed a violation of the VICAR statute, 18 U.S.C. § 1959, the government must prove: 1) the existence of an enterprise; 2) that the enterprise was engaged in racketeering activity; 3) that the defendant had a position in the enterprise; 4) that the defendant committed the violent crime (here, conspiracy to commit murder in aid of racketeering and murder in aid of racketeering); and 5) the defendant's purpose was to maintain and increase his position in the enterprise. *United States v. Keene*, 955 F.3d 391, 394 (4th Cir. 2020) (internal quotations omitted); Tr. at 183 (1/17/24). In this case, the elements of murder were premised on the state offense of murder in violation of Virginia Code § 18.2-32, which encompasses first- and second-degree murder.

A conviction for first-degree murder under Virginia law requires the 'willful, deliberate, and premeditated' killing of another." *United States v. Mathis*, 932 F.3d 242, 265 (4th Cir. 2019) (citing Va. Code § 18.2-32). Under Virginia law, first-degree murder has the following elements: (1) that the perpetrator killed a person; (2) that the killing was malicious; and (3) that the killing was willful, deliberate, and premeditated. *Virginia Model Jury Instructions (Criminal)* (24th ed. 2023). "Second-degree murder is defined as all murders that are not-first degree murder." *United States v. Manley*, 52 F.4th 143, 149 (4th Cir. 2022). "The crime of second-degree murder has two elements. First, the victim must be shown to have died as a result of the defendant's conduct, and second, the defendant's conduct must be shown to be malicious." *Id*. "The question of intent is a factual one for the jury." *United States v. Simmons*, 11 F.4th 239, 271 (4th Cir. 2021).

Canales' contention that he only authorized "clique members to go out and 'look for chavalas'" but "not necessarily kill[] them" is both implausible and contrary to the evidence. ECF 895 at 8. The testimony and evidence presented at trial established that: (1) STLS leadership, including Canales, ordered mid-level members who held the rank of *observación* to commit

murders within a matter of months so that they could ascend in rank, Tr. at 220-221 (1/9/24); (2) STLS required members to commit a murder to advance to the rank of *chequeo* and required them to commit multiple members to become "homeboys," *id.* at 195; (3) MS-13's rules called for rival gang members to be murdered, Tr. at 66 (1/8/24); (4) Canales discussed Guevara and other MS-13 members killing suspected rivals they encountered at random during their patrols, Tr. at 232-238 (1/9/24), Gov't Ex. 53A; and (5) Canales told Guevara that if he and other MS-13 members attacked a rival, they should ensure their prey died, *id.*

After ordering members to move up in rank, Canales knew gang members test-fired guns and looked for rivals to move up in rank. In WhatsApp messages from May 2019, Canales sought photographs of a fully assembled Glock firearm from Guevara while the two of them discussed shooting practice in which Guevara, Arevalo, and others had engaged. Tr. at 230-32 (1/9/24); Gov't Exs. 24-51A, 25-C1. On the night of Tate's murder, Canales told Guevara that he needed to provide Arevalo and the others with a firearm because the members were specifically trying to find someone to kill, telling him "it can't fail." Tr. at 22, 113 (1/10/24); Gov't Ex. 23-59A. On Canales' orders, Guevara coordinated with Arevalo and provided him with the firearm that was used to shoot Tate to death shortly thereafter. Tr. at 24 (1/10/24); Gov't Ex. 23-59A. Andrade boldly asserts that "[t]here is absolutely no evidence of intent to harm Tate." ECF 897 at 2. Despite Canales' and Andrade's attempts to downplay the evidence, the record shows that the gang members lied in wait looking for someone that would satisfy their desire to kill a rival, and that they intended to, and in fact did, harm Tate by shooting him repeatedly, killing him, and achieving Canales' directive.

Guevara also testified to the details subsequently provided to him by Arevalo after Tate's murder. Specifically, that the group was looking for someone to kill and that they identified Tate

as a person of interest that could be from a rival gang. Tr. at 25-26 (1/10/24). This was enough for the members of the gang to kill Tate and earn their promotions. Tr. at 20 (1/11/24). Arevalo also told Guevara that he (Arevalo), Andrade, and Abner Molina, a/k/a Tecolote ("Molina"), all shot Tate, with Arevalo shooting him in the back. Tr. at 26-28 (1/10/24). Andrade also told Guevara that he shot the person (Tate). Tr. at 28 (1/10/24).

Moreover, the jury heard testimony and watched video clips of Andrade's *Mirandized*, post-arrest interview. During that interview, Andrade informed law enforcement that he, Arevalo, Wilmer Cabrera, a/k/a Wiso ("Cabrera"), and Molina were out patrolling near an apartment complex associated with black gangs and looking for someone from a rival gang. Tr. at 14 (1/11/24); Gov't Exs. 39O-1, 39-O1. Arevalo and Molina each had firearms, while Andrade and Cabrera had knives. Tr. at 17-18 (1/11/24); Gov't Exs. 39O-1, 39-O1, 39-P1, 39-P1. They saw Tate walking and talking on his phone and approached him stating "la mara stuff." Tr. at 16-18 (1/11/24); Gov't Exs. 39P-1, 39-P1, 39O-1, 39-O1. Thereafter, Arevalo and Molina shot him. Tr. at 17 (1/11/24); Gov't Exs. 39P-1, 39-P1. Andrade said Arevalo and Molina were the "ones . . . to confront [Tate]" while out on patrol, not the other way around. Tr. at 16-18; Gov't Exs. 39Q-1, 39-Q1. Andrade further stated he intended to use his knife but ultimately did not use it. Tr. at 19 (1/11/24); Gov't Exs. 39Q-1, 39-Q1. Thereafter, the firearms were destroyed and the clothes were burned. Tr. at 19-20; Gov't Exs. 39Q-1, 39-Q1, 39R-1, 39-R1. When asked, Andrade told police the group had prior permission to go hunting. Tr. at 11, 20 (1/11/24); Gov't Exs. 39-R1, 39-R1. Andrade informed law enforcement that after the shooting, he, Molina, and Cabrera were all promoted to the MS-13 rank of *chequeo*, Tr. at 20 (1/11/24), Gov't Ex. 39R-1 and 39-R1, which was consistent with the testimony of Guevara, Tr. at 66 (1/10/24), and Rubio, Tr. at 161 (1/10/24).

While the gang did not specifically identify Tate as a target prior to the night of his murder, they chose to kill him based on the area where they encountered him and because at least one of them believed he could be a rival gang member. They went hunting that night looking for rivals, a fact supported by the messages, the testimony, and Andrade's post-arrest interview. The fact that they chose Tate for their promotion and were incorrect or did not require much evidence with respect to Tate's gang status does not negate the defendants' intent and their goal of achieving a promotion by slaying him. In fact, the entire group involved in Tate's murder, including Andrade, did receive promotions. Furthermore, after Tate was killed, Guevera informed Canales about the success of the murder he had ordered. In a WhatsApp message dated August 29, 2019, Guevara sent a message to Canales informing him that "Those men already ate," meaning the men had already killed. Tr. at 25 (1/10/24); Gov't Ex. 23-60A.

The defendants repeatedly assert that the murder of Tate was part of an "unspecified 'mission'" and that the "clique members were going out to patrol" which does not necessarily mean to find someone to murder. ECF 895 at 8-9. When terrorists bomb a building and kill dozens of people, the fact that they may not have known each individual's identity does not mean that they did not conspire to kill whoever may have been inside at the time. Here, there was no vague mission. There was a specific, simple plan that Canales agreed would be carried out: look for a rival gang member that night and, should a supposed rival be encountered, kill him.

Canales and Andrade's reliance on *United States v. Barnett*, 660 F. App'x 235 (4th Cir. 2016) to support their position that the evidence did not establish the requisite intent to kill Tate is misplaced. *Barnett* is wholly distinguishable from the case at bar. In *Barnett*, the defendant and a co-defendant discussed killing a member of their gang for perceived cooperation, stating that if the report that the target was cooperating was true, the target would be "Double-O." 660 F. App'x at

250. At trial, the government failed to establish that "Double-O" meant anything more than a mission, which could have meant "to punish someone [or] . . . it could also mean to follow any other order, legal or illegal." *Id*. Therefore, the court held that "with no other evidence suggesting that [the defendant] agreed that [the target] would be <u>killed</u>—and not punished, demoted, or assaulted—no rational trier of fact could find…the requisite intent" to murder the victim. *Id*. (emphasis in original).

Here, unlike in *Barnett*, there is ample evidence that Canales, Andrade, and the other members intended to find a target to *kill*, not simply to punish or assault (which obviously would not have served their goal). Indeed, Andrade, in his interview, said that he had a knife the night Tate was murdered, and that he intended to use that knife. Tr. at 18-19 (1/11/24); Gov't Ex. 39P-1. It was thus reasonable for the jury to infer the requisite intent to kill from the possession of deadly weapons by each of the participants in the murder and all of the other evidence presented. Unlike *Barnett*, this is not a case where the government failed to prove the intent to kill.

The defendants' position that they should not have been convicted of murdering Tate because it turned out that he may not have been a rival gang member is also without merit. The testimony established that Arevalo believed Tate was a rival, and the law does not absolve those who intend to kill based on a mistake of fact or who their victim proves to be in the end. For example, Virginia recognizes the doctrine of transferred intent, which – though not directly applicable here – highlights that it is the intent to kill that matters. Pursuant to Virginia law, the concept of transferred intent is as follows: "If an accused shoots at another intending to kill him, and a third person is killed because of the act, that same intent follows the bullet and is transferred to the killing of the third person, even if such death was accidental or unintentional." *United States*

*v. Batts*, 171 F. App'x 977, 983 (4th Cir. 2006) (quoting *Riddick v. Commonwealth*, 226 Va. 244, 308 S.E. 2d 117, 119 (Va. 1983)).

In this case, Canales, Andrade, and their co-conspirators intended to kill. On Canales' orders, MS-13 gang members were provided with a deadly weapon so that they could kill the first rival they encountered. After travelling to an area specifically because they believed they might encounter a rival there and hiding in the woods armed with handguns and knives, they selected a target. The fact that they operated on instinct rather than proof and killed someone who may not have in fact been a rival gang member does not negate their intent. They were determined to kill a rival, they killed someone who at least Arevalo believed to be a rival, and they were all promoted to a rank that required a murder.

In *Simmons*, the Fourth Circuit addressed the question of intent to kill in the context of an order a leader gave to his underlings. *Simmons*, 11 F.4th at 271. The defendant in that case directed his men to "mash the gas" (meaning to kill) on anyone not willing to jump from a rival's group to his own. *Id*. The court found that "[o]nce [the defendant's] men learned that *no one* within [the rival's] line intended to abandon [the rival], the jury could reasonably infer that [the defendant] and his subordinates intended to kill any of [the rival's] men that they encountered." *Id*. Based on this, the court determined that the intent to kill two of the rival's men was satisfied, noting that "[u]nder the common law, the 'specific intent to commit a wrongful act may be conditional'; '[a]n intent to kill, in the alternative, is nevertheless an intent to kill.'" *Id*. (quoting *Holloway v. United States*, 526 U.S. 1, 9-11 (1999).

In this case, Canales ordered Guevara to provide a firearm to those who were going out looking for rivals. Tr. at 22-24 (1/10/24); Gov't Ex. 23-59A. It can be reasonably inferred that if the group, at the direction of their leader, found someone they deemed to be a rival, that they

intended to kill that victim and in fact they did so. As in *Simmons*, the directive was to kill those who were part of a certain group. Andrade and his fellow gang members decided that Tate was a member of that group for the purposes of achieving their goal and carried out that order. Therefore, sufficient evidence established the necessary intent to support convictions as to Counts Nine and Ten.

### C.     Sufficient Evidence Supports Canales' Conviction for Aiding and Abetting the Murder in Aid of Racketeering of Eric Tate.

Canales claims there was insufficient evidence to support his conviction for murder in aid of racketeering based on aiding and abetting liability. As discussed below, substantial evidence supported Canales' conviction for VICAR murder pursuant to a theory of aiding and abetting. Therefore, his motion a judgment of acquittal under Rule 29 should be denied.

"To convict a defendant under an aiding and abetting theory of liability, the jury must find that the defendant (1) took an affirmative act in furtherance of the underlying offense and (2) did so 'with the intent of facilitating the offense's commission.'" *United States v. Odum*, 65 F.4th 714, 721 (4th Cir. 2023) (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014). In order to prove aiding and abetting, "the Government must establish that the defendant participated in the principal's criminal intent, which requires that a defendant be cognizant of the principal's criminal intent and the lawlessness of his activity." *Burgos*, 94 F.3d at 873. "To be convicted of aiding and abetting, 'participation in every stage of an illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about that result.'" *United States v. Arrington*, 719 F.2d 701, 705 (4th Cir. 1983).

Canales took an affirmative step in furtherance of Tate's murder by directing Guevara to provide a deadly weapon to Arevalo and others so they could use it in the event their mission was successful and they encountered a rival gang member to kill. Tr. at 113 (1/10/24). The messages

exchanged between Canales and Guvera supported this testimony. Tr. at 21-25 (1/10/24); Gov't Exs. 23-59A, 23-60A. Canales argues that he did not order Tate or anyone be killed the night of Tate's death and says that MS-13 members had simply gone out to patrol. Unfortunately, he ignores the strong evidence to the contrary.

Canales relies on potential dual meanings of the term "patrol" and the fact that Tate was not on a hitlist to support his argument that he did not aid and abet the murder of Tate. However, the evidence established that if the opportunity to kill a rival gang member on sight without being caught by law enforcement presented itself, gang members could take it. *See* Tr. at 105-06 (1/10/24) ("If there's time then you can follow all those procedures, but if there's not, then you can take care of all of them right then and there."). Certainly, ensuring the group would have a gun was done with the intent of facilitating the VICAR murder of Tate. Issuing a directive to go out and kill rivals and authorizing one's underlings to pursue that directive demonstrates intent to kill any victims that meet that criteria. *Cf. United States v. Bran*, 776 F.3d 276, 280 (4th Cir. 2015) (concluding there was substantial evidence to find that the defendant aided and abetted 18 U.S.C. § 924(j) offense where the defendant ordered prospective gang members to murder the victim and "provided them with a firearm to commit the murder"), *abrogated on other grounds by Lora v. United States*, 599 U.S. 453 (2023). Canales cannot order his underlings to seek out and kill someone they believe is a rival and then subsequently hide behind the fact that the person they chose to kill may not have met the criteria.

Sufficient evidence existed that Tate was murdered by other members of the gang and that Canales, in his leadership role, aided and abetted this murder. By convicting Canales of the murder in aid of racketeering, the jury, following the Court's instructions, found that "some person or

persons" did murder Tate.[2] Canales seems to wish that the jury had been required to indicate special findings he never asked for prior to being convicted. Canales' complaint is unavailing, and no special finding was necessary as "we presume that a properly instructed jury has acted in a manner consistent with the instructions." *United States v. Alerre*, 430 F.3d 681, 692 (4th Cir. 2005).

Viewing the evidence in the light most favorable to the United States, there is substantial evidence to support the jury's conviction as to Count Ten for aiding and abetting liability for Canales.

## II.     The Defendants' Rules 33 Arguments Fail, and They Are Not Entitled to a New Trial.

Rule 33 provides that, "[u]pon [a] defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Such motions, however, are "highly disfavored" and should be "grant[ed] only sparingly.'" *United States v. Ali*, 991 F.3d 561, 570 (4th Cir. 2021) (quoting *United States v. Palin*, 874 F.3d 418, 423 (4th Cir. 2017)). While Rule 33 imbues district courts with discretion to weigh evidence and consider witness credibility, that discretion is still cabined. *See, e.g., United States v. Millender,* 970 F.3d 523, 532 (4th. Cir. 2020) (noting that a district court must "appreciate[] the limits on its discretion" and instructing it to "remain cognizant of the demanding standard for jettisoning a jury verdict."). The Court should not exercise its discretion to grant a new trial unless "it is demonstrated that the fundamental fairness or integrity of the trial result is substantially in doubt." *United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006). "The ultimate test on a Rule 33 motion is

---

[2] While it is not proper for the court to parse out the evidence and speculate as to the jury's determination, Canales fails to acknowledge that evidence in the record supports a finding that others, including Arevalo, the person Canales ordered be given the gun, and Molina were guilty of Tate's murder.

whether letting a guilty verdict stand would be a manifest injustice." *United States v. Aman*, 2022 WL 3371320, at \*13 (E.D. Va. Aug. 16, 2022).

The Fourth Circuit's decision in *United States v. Chavez*, 894 F.3d 593 (4th Cir. 2018) makes explicit that a district court should recognize that "ultimately," the jury bears "responsibility" for resolving evidentiary conflicts and that "even 'disagreement with the jury's verdict [would] not mandate a new trial.'" *Chavez*, 894 F.3d at 608 (quoting *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985)); *United States v. Boddy*, 622 F. App'x 219, 221-22 (4th Cir. 2015) (noting that, even under Rule 33, "the district court must show deference to the jury's verdict."); *United States v. Singh*, 518 F.3d 236, 249 (4th Cir. 2008) (noting district courts must exercise their discretion "sparingly").

### A.    Canales and Aguilera Invited Any Error in Striking Molina's Testimony.

In their post-verdict motions, for the first time, Canales and Aguilera express buyer's remorse for having asked the Court to strike Molina's trial testimony. Canales contends that he made a "quick and largely unconsidered 'decision'" (internal quotations in original) to ask the Court to strike Molina's testimony which – upon further reflection – would have been helpful to him. ECF 895 at 2. Canales and Aguilera further claim that by telling the jury it had determined Molina was not a credible witness and to disregard his testimony, the Court improperly bolstered Guevara's testimony and handicapped them from highlighting alleged previous inconsistent statements in their closing arguments. *Id.* at 5; ECF at 896 at 5. The Court should reject these arguments, which are contrary to the positions they took at trial and, more importantly, contradicted by the record.

The Court should deny Canales and Aguilera's motions to the extent they request relief from a ruling they themselves requested. "The invited error doctrine recognizes that a court cannot

be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request." *United States v. Jackson*, 124 F.3d 607, 617 (4th Cir. 1997) (internal quotations omitted); *see also United States v. Day*, 700 F.3d 713, 727 n.1 (4th Cir. 2012) ("[A] defendant in a criminal case cannot complain of error which he himself has invited." (internal quotation marks omitted)). Canales and Aguilera did not sit on objections. To the contrary, they affirmatively joined in Andrade's request that the Court strike Molina's testimony.[3] By successfully moving to strike, the defendants benefitted from the exclusion of Molina's highly incriminating testimony. Now that they stand convicted of VICAR murder and other crimes, they have had a change of heart and attempt to argue that striking Molina's testimony cut against them. Because Canales and Aguilera invited any error in the exclusion of Molina's testimony, they are not entitled to a new trial on this basis. *See Jackson*, 124 F.3d at 617 (holding that the defendant was not entitled to relief because he invited any error in the stipulation as to his felon status "when he knowingly failed to object"); *United States v. Herrera*, 23 F.3d 74, 76 (4th Cir. 1994) (holding that the invited-error doctrine barred relief on defendant's claim of instructional error because the instruction "was requested by [the defendant]'s counsel" and "reasonably designed to benefit [the defendant].").

Alternatively, even if the Court treats each or both defendants' claims as a failure to object to the Court's rulings, they should still not be retried. When litigants fail to raise a claim during the trial proceedings, plain error review pursuant to Federal Rule of Criminal Procedure 52(b) applies. *Id*. at 135. Rule 52(b) states that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." "While commonly employed

---

[3] In his post-verdict motion, Aguilera notes that "[a] co-defendant suggested the remedy of striking Molina's testimony, and the Court stated it was going to follow that recommendation." ECF 896 at 3. It is important to note, however, that between these two events occurring, he specifically joined that codefendant's request to strike Molina's testimony. *See* Tr. at 11-12 (01/17/24). Aguilera did subsequently tell the Court that while he understood the Court had decided not to declare a mistrial, he wished to make a request for one for the record. Tr. at 16.

by appellate courts, Rule 52 governs disposition of post-trial motions at the district court level." *United States v. Johnson*, 2017 WL 2531582, at *33 (S.D.W. Va. 2017) (analyzing defendant's failure to object to jury instructions during trial proceedings while addressing post-trial motions); *United States v. Perry,* 2014 WL 7240236, at *1 (E.D. Va. Dec. 19, 2014) (applying plain error review while analyzing post-trial motions where defendants failed to object during trial proceedings).

To establish plain error, Canales and Aguilera must establish the following four criteria: (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the defendant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* (citing *United States v. Marcus*, 560 U.S. 258, 262 (2010)). As explained below, Canales and Aguilera have not, and cannot, meet their burden.

**B.   The Striking of Molina's Testimony at the Defendants' Request Does Not Warrant a New Trial.**

1.   Molina's Testimony Was Heavily Incriminating as to Canales and Aguilera

a.   Molina's Testimony About Canales' Order to Kill Rival Gang Members

Molina testified extensively about Canales' leadership role in the gang, his involvement in the drug trafficking conspiracy, his role in ordering members to commit murders generally, and the order he gave that resulted in the August 2019 murder of Eric Tate. With respect to the order to kill and the murder of Tate, Molina's testimony included, but was not limited to, the following information:

During the summer of 2019, Canales instructed Molina and other members of the gang that they had to start murdering rival members to rise in rank and the murders needed to occur within

a matter of months. Tr. at 25 (1/12/24). Canales wanted people to move up in rank because the clique wanted to get more "turf." *Id.* As a result, Molina and other members went on a mission in the Chirilagua neighborhood of Alexandria to find rival gang members. *Id.* at 26. The mission, however, was unsuccessful. *Id.*

Molina and Arevalo received authorization from Canales to commit a murder the evening that Tate was killed, and Canales had advised that he would tell Guevara to provide them with a firearm. *Id.* at 33-35.[4] After speaking with Canales and rendezvousing with Cabrera, Molina, Arevalo, and Cabrera went to Guevara's residence and obtained a handgun. *Id.* at 35-36. Molina, Arevalo, and Cabrera then drove to the Americana grocery store and met up with Andrade. *Id.* at 37-38. Molina and Arevalo were each armed with a firearm, and Cabrera had a knife. *Id.* at 36-37.

The four men planned to kill any rival gang member they encountered. *Id.* at 39. From a wooded area near an apartment complex, the four men observed Tate on foot. *Id.* at 39-40. Arevalo felt that Tate was a rival gang member and said that he would be their victim. *Id.* at 41. Arevalo instructed them to walk in pairs so as not to scare Tate. *Id.* When Arevalo and Andrade approached Tate, Arevalo began shooting him in his back and then handed the gun to Andrade. *Id.* at 42. Andrade continued shooting. *Id.* Eight shots were fired from that gun. *Id.* Molina saw Tate shoot a firearm as well and heard approximately one shot. *Id.* Molina did not shoot at Tate because Molina had never seen Tate before and did not believe Tate was in fact a rival gang member. *Id.* at 43. Molina claimed he threw the single bullet from his weapon in the woods but told others that he had in fact shot Tate as well because disobeying clique orders carried consequences. *Id.* at 43-44.

---

[4] Molina's testimony corroborated that of Guevara, who testified that Canales had ordered him to provide Arevalo with a firearm because Arevalo and other STLS members were going to look for a rival gang member to kill that night. Tr. at 24-25 (1/10/24). A WhatsApp exchange further corroborated Molina's testimony. Gov't Ex. 23-59A.

After leaving the scene in a vehicle, they went to Turcios' house in Maryland. *Id.* at 44-45. While *en route* to Turcios' residence, Arevalo called Canales and told him the mission had been completed and that they would tell him the details later. *Id.* at 45. After the homicide, Canales told Molina he would discuss Molina being promoted with the clique, and Canales later informed Molina that Molina had risen to the rank of *chequeo*. *Id.* at 46. Canales further said that Andrade and Cabrera were also being promoted to the rank of *chequeo*. *Id.* at 46-47. Because Arevalo was already a *chequeo* at the time of the Tate murder, Canales stated the killing would count as a credit for him to further advance within the gang. *Id.* at 47. Canales and Menjivar gave Molina a new *taca* after the shooting. *Id.* at 50. His *taca* changed from "Rino" to "Tecolote" when he moved up in rank. *Id.*

b.  <u>Molina's Testimony About Aguilera's Involvement in Smith's Murder</u>

Molina's testimony about the Antonio Smith murder included, but was not limited to, the following: The day prior to Smith's murder, Guevara informed Molina that Aguilera was bringing drugs from New York to Virginia and was also bringing a firearm with him. *Id.* at 52-53. Guevara called Canales in Molina's presence and Canales authorized the three of them to seek out a victim and kill him. *Id.* at 59. Aguilera arrived at Guevara and Molina's residence with a handgun, and the three men planned to find a rival gang member and kill him. *Id.* at 52-58.

Molina, Guevara, and Aguilera drove around Virginia and Maryland for hours hunting for a person to kill without success. *Id.* at 60-63. Upon their return, Guevara spotted Mr. Smith leaving a 7-Eleven carrying a bag and decided that he would be their victim that night. *Id.* at 63. After making a U-turn, Guevara and Aguilera got out of the car and approached Mr. Smith. *Id.* at 64. Guevara said "asshole turn around" and started shooting Mr. Smith. *Id.* at 64. Guevara then handed the firearm to Aguilera so that he would shoot as well. *Id.* Aguilera continued firing. *Id.* Mr. Smith

was on the ground asking for help. *Id.* Molina then ran up and Aguilera handed him the weapon. *Id.* at 64-65. Aguilera told Molina to shoot, but the weapon was out of ammunition. *Id.* at 65. The three men got in the car and drove towards Fredericksburg, Virginia. *Id.* Guevara said he was going to call Canales. *Id.* at 66. Guevara was on the phone stating the mission had been completed. *Id.* Guevara's girlfriend, Keyly Guzman, obtained a hotel for the group and they went to a Walmart to buy new clothes. *Id.* at 67-68. Molina assisted in destroying the gun and clothes thereafter and went to New York with Canales. *Id.* at 71-72. As a result of killing Smith, Aguilera moved up to *chequeo* after the shooting and received a new *taca* of Psicólogo. *Id.* at 74. On cross examination, counsel for Aguilera attempted to impeach Molina based on various prior statements he made to law enforcement, including who drove during various aspects of the crime. *See, e.g.*, *id.* at 100-01, 116-18. Throughout cross examination, Molina often refused to concede a prior inconsistent statement and noted he had problems with the Spanish interpreters used during his law enforcement debriefs. *See, e.g.*, *id.* at 104, 118.

2. Molina's Testimony Was Not Favorable to Canales or Aguilera, and the Defendants' Claims of Prejudice are Without Merit

Having been convicted, Canales and Aguilera now claim they wish the Court had allowed the jury to consider Molina's testimony because this would have been favorable to them. Canales contends that he could have impeached Molina's testimony concerning phone calls Molina said Canales conducted by pointing to the fact that no records of any such calls had been admitted at trial and the United States' other critical cooperating witness had not testified about those calls. Rather than the Court telling the jury that the prosecution had called a witness who should not be believed and whose testimony (the majority of which was manifestly inculpatory and corroborated by other evidence) should be disregarded in its entirety, Canales apparently would have preferred the jurors to have been free to consider Molina's testimony and to have argued that they should

23

not believe a specific fraction of it. This argument has two fatal flaws: (1) it is illogical; and (2) nothing inhibited Canales from cross-examining other witnesses or pointing to a lack of phone calls or some other evidence tying him to the murders in his closing argument.

Aguilera, in a similar vein, claims that he would have been better off had the jury been able to consider purported inconsistencies in statements Molina had made about Aguilera's involvement in the Smith murder. He is mistaken. The overwhelming majority of Molina's testimony aligned with that of Guevara and was corroborated by WhatsApp messages Aguilera exchanged with Canales, GPS data, and other evidence. *See, e.g.*, Tr. at 34-37 (1/10/24); Gov't Ex. 23-26A; Tr. at 86-87, 122-23 (1/11/24); Tr. at 177-193 (1/12/24): Gov't Exs. 67-1, 63-2. As discussed above, Molina testified that (1) Aguilera was a member of a hunting party that spent hours looking for someone to kill, (2) Aguilera shot Smith, and (3) Aguilera shot Smith so many times that his pistol was empty when he handed it to Molina. Notwithstanding the foregoing, Aguilera now posits that striking Molina's testimony weakened his case because doing so undermined his plan to highlight alleged inconsistencies[5] in Molina's version of events, such as who was driving at various points of an hours-long car ride that happened more than four years prior. ECF 896 at 6. Looking at the record as a whole, Aguilera's cross-examination of Molina was not favorable to him, and any points Aguilera may have scored would have been dramatically outweighed by Molina's inculpatory testimony against him. Thus, there was no manifest injustice in striking Molina's testimony, and a new trial is not warranted.

---

[5] On cross examination, Molina was thoroughly questioned about variances between his trial testimony, a translation/transcription of a debrief conducted with the Prince William County Commonwealth Attorney's Office, and FBI 302 debrief reports that he neither authored nor adopted. Tr. at 75-120 (1/12/24). Molina repeatedly attributed those variances to Spanish interpretation issues and rarely conceded having made inconsistent statements to law enforcement. *See, e.g.*, Tr. at 104, 118 (1/12/24)

Canales also argues that the jury's inability to consider Molina's testimony concerning threats conveyed to him by Guevara prejudiced him because that testimony would have supported the notion that Guevara was a "rogue member, prone to random acts of violence outside of gang rules." ECF 895 at 3. This argument is similarly unpersuasive. First, the record is devoid of any indication that Guevara's purported threats were *not* authorized by the gang. Second, the record is devoid of any violent acts Guevara committed that were not carried out on MS-13's orders. Third, the record is full of examples proving Guevara to have been a loyal MS-13 solider who did what Canales told him to do. Throughout the course of the trial, jurors saw and heard WhatsApp messages reflecting that Guevara sought out potential victims (whom Canales told him how to kill) and reported his progress to an impatient Canales. *See, e.g.*, Tr. at 230-35 (1/9/24); Gov't Exs. 23-52A, 23-53A. They watched a video recorded after Guevara had a sexual encounter with a fellow gang member's girlfriend (for which Guevara himself was physically beaten) wherein Canales taught Guevara how and where to strike the woman with a baseball bat for her disrespect. Tr. at 201-202 (1/9/24); Gov't Ex. 23-80B. They also saw a WhatsApp exchange wherein Guevara submitted to Canales and agreed to provide a firearm with which he did not wish to part to Arevalo on Canales' orders. Tr. at 22-24 (1/10/24); Gov't Ex. 23-59A.

Finally, Canales argues that the greatest prejudice he has suffered as a result of the striking of Molina's testimony arises from Molina's statements regarding MS-13's views on killing non-rivals or individuals it does not believe deserve to die. ECF 895 at 3-4. Indeed, Molina testified that he chose not to shoot Tate because he had never seen him before and did not believe Tate to be a rival gang member. Tr. at 43 (1/12/24). Canales' argument ignores Molina's other testimony, which was echoed by Guevara, that Arevalo believed Tate to have been a rival gang member. *Id.* at 41. Also, as discussed *supra*, regardless of Tate's status as a gang member, the requisite intent

to kill Tate existed and Molina's testimony on this issue was insignificant and heavily outweighed by his inculpatory testimony. *See* Section I, B. Canales fails to establish plain error, and even if such arguments were preserved, he fails to establish a manifest injustice warranting a new trial. As demonstrated above, the testimony of Molina was incriminating against Canales and would have provided stronger evidence against Canales had the jury been permitted to consider it.

### 3. Striking Molina's Testimony Did Not Bolster Guevara's Credibility

Prior to closing argument, the Court instructed the jury as follows:

> I have determined, based upon information brought to my attention, that the testimony of Mr. Molina and any exhibits that he was used to introduce are to be stricken from the record.  So as you think about this case, you must disregard any evidence presented through Mr. Molina, whom I have found to be not a credible witness.[6]

Tr. at 57 (01/17/24). Canales and Aguilera decry the Court's words as having implicitly bolstered Guevara's credibility. ECF Nos. 895 at 5-6; 896 at 5. Their arguments that the Court's comment on Molina's credibility warrants a new trial should rejected for numerous reasons. First, the comment does not bolster Guevara's testimony. In fact, the comment makes no mention of Guevara, Karen Figueroa, Rubio, or any of the numerous law enforcement officers who testified at trial.

Second, the Court informed Canales and Aguilera of the instruction it planned to give the jurors upon their return to the courtroom and prior to closing arguments, and neither defendant objected before, during, or after it was given. Tr. at 14-15, 57 (01/17/24). "The point of error-preservation rules…is to give the district court the first opportunity to consider an issue and correct any errors." *United States v. Duroseau*, 26 F.4th 674, 678 (4th Cir. 2022). "The contemporaneous-

---

[6] The Court made its finding after Andrade argued that Molina purportedly bragging about committing the double murder to a tipster in a restaurant was inconsistent with his testimony about why he had told the police he committed the murders. *See* Tr. at 9-10 (1/17/24).

objection rule prevents a litigant from 'sandbagging' the court – remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Puckett v. United States*, 556 U.S. 129, 135 (2009). "[R]equiring the objection means the defendant cannot 'game' the system, 'waiting to see if the [outcome] later strikes him as satisfactory, and then seeking a second bite at the apple by raising the claim." *Id*. at 140.  Accordingly, the Court should analyze the defendants' arguments through the lens of plain error and find that they have failed to meet their heavy burden in seeking a new trial. *See id.* at 135, 140; *Perry,* 2014 WL 7240236, at *1.

Third, the lone comment ignores the entirety of the instructions given to the jury.  After closing arguments, the Court read jury instructions for the case. Relevant to Molina's testimony, the Court stated:

> Now, any proposed testimony or proposed exhibit to which an objection was sustained by the Court, and any testimony or exhibit ordered stricken by the Court must be entirely disregarded by you. And I'll remind you that the testimony of Mr. Molina has been stricken from this case, and we are still working on getting any exhibits that might have been introduced through his testimony also removed from the exhibits.

Tr. at 145 (1/17/24). At no point in this instruction did the Court state anything about the credibility of Molina or Guevara.

Moreover, while reading the rest of the jury instructions, the Court provided all of the standard instructions related to the credibility of witnesses, including: "You, as jurors, are the sole and exclusive judges of the credibility of each of the witnesses called to testify in this case, and only you determine the importance of weight, if any, that their testimony deserves." Tr. at 152 (1/17/24). Additionally, the Court provided instructions on assessing the credibility of accomplices, the credibility of cooperating witnesses, the effect of felony convictions, and the

effect of drug abuse on the credibility of a witness. Tr. at 152-56 (1/17/24). The Court further instructed the jury: "Nothing that I have said or done during the course of the trial is intended in any way to somehow suggest to you what I think your verdict should be" and "[a]s I've told you many times, you are the sole judges of the facts." Tr. at 199 (1/17/24). Considered as a whole, these instructions dispelled any risk that the striking of Molina's testimony somehow bolstered Guevara's testimony. Accordingly, the motions for new trial must be denied.

4.   Aguilera Has Failed to Establish That the Court's Curative Instruction Concerning Molina's Testimony Was Insufficient

Aguilera also argues that, due to the volume of Molina's testimony and the amount of time that passed until the jury was told to disregard it, the Court's instructions to the jury did not cure alleged prejudice he suffered. ECF 896 at 4-5. This argument must be rejected. As noted above, Aguilera moved to strike Molina's testimony and failed to object to the Court's curative instructions. Thus, plain error review applies. Curative instructions were provided to the jury immediately after the Court decided to strike Molina's testimony and again while providing jury instructions before deliberations. The Supreme Court and Fourth Circuit have repeatedly held that jurors are presumed to follow instructions, including instructions to disregard evidence. *See, e.g., Yates v. Evatt*, 500 U.S. 391, 403 (1991) (discussing "sound presumption" "that jurors are reasonable and generally follow the instructions they are given"); *Alerre*, 430 F.3d at 692 ("Ordinarily . . . we presume that a properly instructed jury has acted in a manner consistent with the instructions").

Because proper curative instructions were given and ample evidence established his guilt, Aguilera fails to establish he is entitled to a new trial. *See, e.g., United States v. Jackson*, 327 F.3d 273, 296-98 (4th Cir. 2003) (finding a new trial not warranted in a death penalty case where the trial court struck a jail cellmate's testimony as untrustworthy and unreliable and provided a

limiting instruction); *United States v. Jones*, 907 F.2d 456, 460 (4th Cir. 1990) (finding no error where court withdrew previously admitted semi-automatic ammunition seized from defendant's residence and provided limiting instruction adding, "in light of the abundant evidence against the defendants, there is no reasonable probability that the jury's verdict was influenced by the jury's seeing this later-excluded evidence."). In addition to the Court's instructions, there was abundant evidence, apart from Molina's stricken testimony, establishing Aguilera's guilt beyond a reasonable doubt. Such evidence included: (1) Guevara's detailed testimony regarding Aguilera's involvement in killing Smith, Tr. at 32-60 (1/10/24); (2) WhatsApp messages between Aguilera and Canales discussing Aguilera's arrival in Virginia shortly before the Smith murder to "go patrol," Tr. at 34-36 (1/10/24); Gov't Ex. 23-26A; (3) GPS location data corroborating Guevara's testimony about where the defendants traveled before, during, and after Smith's murder, Tr. at 117, 127, 161-163 (1/11/24); Tr. at 177-193 (1/12/2024); Gov't Exs. 61, 62-1, 67-1; (4) the hotel receipt for the Motel 6 in Fredericksburg in Guzman's name, Gov't Ex. 63-2; (5) Officer Wulff's testimony regarding the car stop with Aguilera and Guevara in New York days after the murder, Tr. at 104-109 (1/11/24); Gov't Exs. 33-1A, 33-1B; and (6) Karen Figueroa's testimony regarding statements made in her presence between Guevara and Andrade regarding Guevara's involvement in the murder of a "black man," Tr. at 98 (1/11/24). Accordingly, Aguilera's motion for new trial must be rejected.

### C. The Verdicts Were Not Split and, Even if they Were, Binding Precedent Forecloses Canales' Attempt to Obtain a New Trial.

Canales' additional attempts to obtain a new trial based on purportedly split verdicts, *see* ECF 895 at 6-11, must be rejected. While Canales contends that he cannot be convicted of aiding and abetting the murder of Tate when Andrade was acquitted of the same offense, conviction of a principal is not a prerequisite for a conviction for aiding and abetting. *United States v. Horton*, 921

F.2d 540, 543-44 (4th Cir. 1990). Under 18 U.S.C. § 2, "all participants in conduct violating a federal criminal statute are 'principals.' As such, they are punishable for their criminal conduct, the fate of the other participants is irrelevant." *Standefer v. United States*, 447 U.S. 10, 20 (1980) (upholding the conviction of a defendant for aiding and abetting, despite the principal being acquitted in a separate trial). In fact, "to obtain a conviction for aiding and abetting, the government need not prove the actual identity of the principal, 'provided the proof shows that the underlying crime was committed by someone.'" *Horton*, 921 F.2d at 544 (quoting *United States v. Perry*, 643 F.2d 38, 45 (2d Cir. 1981)).

Similarly, Canales' argument that Andrade's VICAR murder acquittal "suggests that the defense of self-defense was accepted by the jury" and, therefore, Tate was not "murdered" is without merit.  ECF 895 at 11. There are additional and more plausible theories as to how they jury reached its verdicts.[7] More importantly, however, it is not the Court's job to put the jury's verdicts under a microscope and determine what evidence the jurors did and did not accept in reaching their conclusions. The Fourth Circuit has made it explicitly clear that "inconsistent verdicts should not necessarily be interpreted as a windfall to the government at the defendant's expense." *Thomas*, 900 F.2d at 40. This is because "[i]t is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." *Id.*. In general, "the actual rationale underlying the jury's verdicts (and lack thereof) are typically not the proper subject of judicial inquiry," even under Rule 33. *United States v. Moore*, 763 F.3d 900, 913 (7th Cir. 2014) (citing Fed. R. Evid. 606(b)); *Tanner v. United States*, 483 U.S. 107 (1987).

---

[7] While it is not proper for the court to parse out the evidence and speculate as to what the jury was considering, Canales fails to note that evidence in the record supports a finding that Arevalo was guilty of Tate's murder.

It is not the Court's role to second-guess the jury's verdicts, even when an apparent inconsistency might appear. "[I]ndividualized assessments of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake," so "[c]ourts have always resisted inquiry into a jury's thought processes." *Id.* at 66-67. That is why a Rule 33 analysis is not focused on the jury's reasoning but on the weight of the *evidence* presented at trial, and whether it weighs so heavily against the verdict that it would be unjust to enter judgment.

While Canales claims his conviction and the acquittal of Andrade represents an inconsistency in the verdict, Rule 33 does not permit the granting of a new trial based on purportedly inconsistent verdicts. *See United States v. Perry*, 335 F.3d 316, 322 (4th Cir. 2003) (denying new-trial motion based on inconsistent verdicts); *United States v. Green*, 599 F.3d 360, 369 (4th Cir. 2010) ("[I]t has long been settled that inconsistent jury verdicts do not call into question the validity or legitimacy of the resulting guilty verdicts"). "[T]he Supreme Court has made it clear that a defendant cannot challenge [her] conviction merely because it is inconsistent with a jury's verdict of acquittal on another count." *United States v. Thomas*, 900 F.2d 37, 40 (4th Cir. 1990); *see also Dunn v. United States*, 284 U.S. 390, 393 ("consistency in the verdict is not necessary"). In *Powell*, the jury found the defendant guilty of multiple counts of using the telephone to facilitate a conspiracy, but not guilty of conspiracy to distribute cocaine, and not guilty of possession with intent to distribute cocaine. *Powell*, 469 U.S. at 60. The Court recognized the inconsistency in outcomes but held that a defendant convicted by a jury on one count could not attack his conviction because it was inconsistent with the jury's verdict of acquittal on another count. *Id.* at 62-64; *see also Green*, 599 F.3d at 369.

**D.    The Tip Received by the Prince William County Police Department Does Not Warrant a New Trial.**

Canales' and Andrade's claims that they are entitled to a new trial based on an alleged *Brady* violation and newly discovered evidence must be rejected. ECF 895 at 12; ECF 896 at 2. Under *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny, the government must disclose material evidence favorable to the defendant. Evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682 (1985). Furthermore, "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources." *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990) (citing *United States v. Grossman,* 843 F.2d 78, 85 (2d Cir.1988) (no *Brady* violation when defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence"); *Lugo v. Munoz,* 682 F.2d 7, 9–10 (1st Cir.1982) (government has no *Brady* burden when facts are available to a diligent defense attorney). "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994); *see also United States v. Hendrick*, No. 3:21cr14, 2021 WL 3130867, at *3 (E.D. Va. July 23, 2021) ("*Brady* claims generally arise after trial.").

With respect to newly discovered evidence, the Fourth Circuit has developed a five-part test for evaluating motions for a new trial based on newly discovered evidence.  Under *United States v. Chavis,* 880 F.2d 788, 793 (4th Cir. 1989), a motion for new trial should be granted only if: (1) the evidence is newly discovered; (2) the movant exercised due diligence in discovering the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues; and (5) the evidence would probably have resulted in an acquittal at a new trial.  Because

the government did not violate *Brady*, and because the *Chavis* standard has not been met in this case, no new trial is warranted and the jury's verdicts should stand.

In April 2022, the government produced a Prince William County Police ("PWCPD") report in discovery stating there was a tipster who reported to police that Molina was not the only individual responsible for murdering Beltran and Mayorga and that someone named Hector was also involved.  The report described efforts that PWCPD detectives took to make contact with the tipster, who had called dispatch and been referred to an online tip reporting system, and their inability to successfully do so. Four months prior to Trial 1, the government also produced an email from a PWCPD detective that stated that the tipster said Molina and "Hector Naranjo" had bragged to her about committing the double murder.[8]  Tr. at 4-5 (1/17/24).

The government received no inquiries concerning the tip referenced in the police report and more fully documented in the detective's email until Arevalo's attorney emailed government counsel on January 14, 2024. None of the defendants cross-examined Molina about the tip the PWCPD had received even though they had been provided with discovery well in advance of trial disclosing that a woman said he and someone named "Hector Naranjo" had been bragging about committing the double murder in the Taco Baja restaurant in Manassas.

While the identity of "Hector Naranjo" was a mystery to the United States, *see* Tr. at 8-9 (1/17/24), Arevalo figured it out. During Arevalo's cross-examination of Guevara during Trial 2, Arevalo asked if Guevara had gone by the name Hector Naranjo, and he confirmed that he had used a Facebook profile with that name. Tr. at 141-42 (1/25/24). Arevalo asked Guevara if people

---

[8] That email and others, which the government received in late August 2023 in response to a request for any outstanding Jencks Act materials the government had not already been given, were produced to the defendants on September 5, 2023. The email was in a digital folder labeled as being Jencks Act materials for the lead detective who investigated the murders of Beltran, Mayorga, and Tate.

33

who were Facebook friends with him would know him by that name, and he confirmed that they would. Tr. at 142-43 (1/25/24). Guevara explained that Molina had created the Hector Naranjo Facebook profile but that Guevara was the only one who utilized that profile after Molina eventually stopped. *Id.* at 142.[9] Arevalo also pointed out that the Hector Naranjo Facebook profile was associated with one of three phones that law enforcement seized from Guevara when he was arrested, and Guevara confirmed that was correct.[10] *Id.* at 142-143. The government's lead case agent later testified that the first time he became aware that Guevara was associated with the Facebook username "Hector Naranjo" was after Guevara's testimony during the second trial. Tr. at 187-88 (1/29/24).

In light of the foregoing, it cannot be said that Canales or Andrade is entitled to a new trial due to a *Brady* violation or under Rule 33. The United States produced the detective's report years before trial, and the email containing additional exculpatory information months before trial. The fact that the name contained in that email, "Hector Naranjo," was associated with Guevara was unknown to the government but nevertheless made discoverable to the defendants via the government's production of Guevara's phone extraction to the defendants ten months before Trial 1 began. As noted above, Arevalo made the connection and used those materials to cross-examine Guevara during Trial 2. Furthermore, Guevara explained his own role in the double-murder to the Trial 1 jurors in detail, and those same jurors had the benefit of reviewing WhatsApp conversations

---

[9] The government was aware that the account had at one point been associated with a phone seized from Molina but was unaware that Guevara had utilized the account. Through the use of a search warrant, the government had previously obtained data from Meta Platforms, Inc. tied to a different Facebook account utilized by Guevara ("Mario Elegante HD Rivera").

[10] In April 2022, the government produced a partial extraction of the device in question. In February 2023, after the FBI's Computer Analysis Response Team managed to obtain a full extraction of the device's data, the government produced the full data extraction tied to that device to the defense in discovery.

wherein Guevara discussed who had participated in the double-murder and what had transpired with other co-conspirators.  Tr. at 250-51, 254-57 (1/9/24); Gov't Exs. 26-8A, 26-12A, 12C1-C2, 26-16A.

Critically, Guevara's unknown linkage to the Hector Naranjo Facebook profile was not material and would not have resulted in an acquittal had it been presented to the Trial 1 jurors. None of the Trial 1 defendants were charged with VICAR murder counts or killing a witness as it related to the double murder.  The defendants who were charged with those offenses in Trial 2 were convicted despite the Trial 2 jury being made fully aware of the tip and Guevara's linkage to the Hector Naranjo Facebook profile. Accordingly, the motion for new trial based on Guevara using the Hector Naranjo Facebook account should be denied.

## CONCLUSION

Wherefore, for the foregoing reasons, the Court should deny the defendants' post-verdict motions and allow the jury's well-reasoned verdicts to stand.


Respectfully submitted,

Jessica D. Aber
United States Attorney


By: _____/s/_____
John C. Blanchard
Maureen C. Cain
Assistant United States Attorneys

Matthew K. Hoff
Department of Justice Trial Attorney
Violent Crime and Racketeering Section

## CERTIFICATE OF SERVICE

I certify that on February 15, 2024, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause a true and accurate copy of this document to be transmitted to counsel of record.

By:       _____/s/_____
John C. Blanchard
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3999
Fax:   (703) 299-3980
John.Blanchard@usdoj.gov