IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| vs. : | 1:21-CR-260 |
| : | |
| CRISTIAN AREVALO ARIAS, : | |
| : | |
| Defendant. : | Honorable Leonie M. Brinkema |
| : | |

**MOTION FOR ACQUITTAL**

In this racketeering case, Mr. Arevalo was acquitted of all charges related to the homicide of Eric Tate but convicted of all charges related to the double homicide of Milton Beltran Lopez and Jairo Mayorga. Mr. Arevalo hereby moves for a judgment of acquittal pursuant to FED. R. CRIM. P. 29. Additionally, Mr. Arevalo asks that the Court conditionally determine that "a new trial should be granted if the judgment of acquittal is later vacated or reversed." FED. R. CRIM. P. 29(d)(1).

**I.      This Court Must Enter a Judgment of Acquittal on Special Finding Three of Count One.**

   a.  Facts.

Mr. Arevalo was tried and acquitted of all counts related to the murder of Eric Tate. *See* Doc. 900 (Verdict Form) at Count Nine, Count Ten, and Count Eleven. Notably, Mr. Arevalo was acquitted of both *conspiring* to commit Eric Tate's murder (Count Nine) and *aiding and abetting* Tate's murder (one of the bases of liability for Count Ten). Thus, the jury not only rejected the allegation that Mr. Arevalo was Tate's shooter (as the government alleged), but also the allegation that Mr. Arevalo had any role in the conspiracy to kill him. At the same time, the jury convicted Mr. Arevalo of Count One (racketeering conspiracy). Mr. Arevalo does not ask

1

this Court to aside that conviction. Rather, this Court should enter a judgment of acquittal with respect to Special Finding Three to Count One, in which the jury checked "Yes" to the following question:

> We, the jury, having found the defendant guilty to the offense charged in Count One, further unanimously find that as part of that offense, the defendant, on or about August 29, 2019, while aiding and abetting others, did willfully, deliberately, maliciously, and with premeditation kill Eric Lanier Tate . . . .

    **b. Rule 29 Analysis.**

This Court "is invested with a wide discretion" in considering a motion for judgment of acquittal. *Johnson v. United States*, 265 F.2d 496, 497 (4th Cir. 1959). Viewing the evidence "in the light most favorable to the prosecution . . . [t]he question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." *White v. United States*, 279 F.2d 740, 748 (4th Cir. 1960). In this case, even viewing the evidence in the light most favorable to the prosecution, there is insufficient evidence to find Mr. Arevalo guilty of aiding and abetting the murder of Eric Tate. Of course, this is why the jury acquitted Mr. Arevalo of both conspiring to commit and aiding and abetting Tate's murder.

    The evidence supporting Mr. Arevalo's involvement in the Tate homicide is far from "substantial." Only one witness, Mario Guevara Rivera, connected Mr. Arevalo to that homicide. Guevara testified that he was not present for the Tate homicide and had not participated in it but had provided Mr. Arevalo with a Sig Sauer handgun Mr. Arevalo supposedly used to commit the homicide. Tr. 1/24/24 at 131–36; 1/25/24 at 140. Guevara testified that this gun belonged to both him and Aguilera personally, which explained both the supposed clarity of his memory and his reluctance to lend it to Mr. Arevalo. *See id.* But firearm examiner Cara McCarthy testified that the gun used in the Tate homicide was "consistent with . . . a Smith & Wesson MMP series 9-millimeter Luger pistol," *not* "a SIG Sauer 9-millimeter

2

Luger pistol." Tr. 1/23/24 at 235, 242–43.  On cross-examination, Guevara originally claimed that he did not remember owning a Smith & Wesson M&P series 9-millimeter, but when confronted with a picture of one from his phone, Guevara changed his story and claimed that he had given *that* gun to Mr. Arevalo.  Tr. 1/24/24 at 146–47.

Guevara also claimed that after the Tate homicide, Mr. Arevalo and Andrade had given him detailed accounts of the offense.  *Id.* at 137–43.  However, Guevara also admitted that he personally had gone to the exact same apartment complex before looking for someone to kill. Tr. 1/24/24 at 140–41.  Moreover, as Mr. Arevalo discussed in closing argument, the Tate homicide had a lot of similarities to the homicide of Antonio Smith, in which Guevara had shot a random Black man in the opening to a nearby apartment complex.  The fact that the Tate homicide fit Guevara's own *modus operandi*, Guevara's impeachment regarding the gun he supposedly gave Mr. Arevalo, and Guevara's many other credibility issues made his testimony an insufficient basis on which to convict Mr. Arevalo.  This is especially true considering Guevara's testimony that he was not present for the homicide.  Even if the Court were to take Guevara's testimony at face value, it would provide support only for the contention that he loaned Mr. Arevalo some gun—and not anything that happened thereafter.  This Court should thus enter a judgment of acquittal with respect to Special Finding Three on Count One.

      c.  **Alternative Basis for Relief.**

Either as a conditional ruling under Rule 29(d)(1) or as an alternative basis for relief under Rule 33, it is also in the interest of justice for this Court to set aside Special Finding Three. As a starting point, Special Finding Three is in direct conflict with Mr. Arevalo's acquittal of all counts related to the death of Eric Tate.  In Count One, Mr. Arevalo was charged with a violation of 18 U.S.C. § 1962(d), which criminalizes racketeering conspiracy.  The penalties for a

3

violation of this section are provided in 18 U.S.C. § 1963, which increases the maximum penalty from twenty years to life "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." The Special Finding thus alleged that during a racketeering conspiracy, Mr. Arevalo "while aiding and abetting others, did willfully deliberately, maliciously, and with premeditation kill Eric Lanier Tate." However, Mr. Arevalo was acquitted of both conspiring to kill Eric Tate and aiding and abetting his murder. The Special Finding thus cannot be squared with the actual counts of conviction. In other words, Mr. Arevalo's acquittals of conspiracy and aiding and abetting logically exclude the special finding.

The United States Supreme Court has held that a defendant is not entitled to a new trial just because there are inconsistent verdicts between two counts. *See United States v. Powell*, 469 U.S. 57 (1984). One of the reasons that inconsistent *verdicts* between two counts may stand is that they "present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored." *Id.* at 65. But that does not mean that this Court cannot or should not set aside the special finding in this case. In fact, there are at least three reasons that setting aside the special finding in this case is different from ordering a new trial on an inconsistent verdict between *counts*.

*First*, the Court in *Powell* specifically noted that "[n]othing in this opinion is intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count *logically excludes* a finding of guilt on the other." *Id.* at 69 n.8 (emphasis added). This is known as "a mutually exclusive" verdict and, in this case, the jury's decision can be reviewed. *See, e.g.*, *United States v. Randolph*, 794 F.3d 602, 610–11 (6th Cir. 2015); *see also United States v. Pierce*, 940 F.3d 817 (2d Cir. 2019) (setting aside "facially inconsistent jury verdicts" resulting from special findings); *United States v. Shippley*, 690 F.3d

4

1192 (10th Cir. 2012) (Gorsuch, J.) (noting that *Powell* may permit, but does not *require* acceptance of inconsistent verdicts, let alone "metaphysically impossible" verdicts); *see also United States v. Gatlin*, 90 F.4th 1050, 1066–68 (11th Cir. 2024) (adopting Justice Gorsuch's reasoning in *Shippley*). Separately, the United States Supreme Court has suggested that the remedy for an inconsistent special finding is a new trial. *See Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 400 n.11 (1972).[1] Here, Special Finding Three alleged that Mr. Arevalo "while aiding and abetting others, did willfully deliberately, maliciously, and with premeditation kill Eric Lanier Tate." This finding is logically excluded by the jury's acquittal of both aiding and abetting Tate's murder and conspiring to kill Tate.

*Second*, the case law governing inconsistent verdicts largely deals with inconsistencies between counts of conviction, not inconsistencies between counts and a special finding. There are many good reasons to treat a special finding differently. One reason was suggested by the Fourth Circuit in *United States v. Ramirez-Castillo*, 748 F.3d 205 (4th Cir. 2014). In that case, the district court gave the jury special interrogatories "[i]nstead of requiring them to determine whether [the defendant] was guilty, beyond a reasonable doubt, of each element of the charged offense." *Id.* at 213. When reversing the defendant's convictions, the Fourth Circuit discussed the fact that the special verdict form contained yes or no questions instead of "guilty" or "not guilty." *See id.* at 213–15. The Court noted that "[t]he jury simply answered 'yes' to each question'" and never found the defendant "guilty of the charged offense." Thus, the jury made

---

[1] As the Fourth Circuit has explained in the civil context, "[w]hen a special verdict form is used and the jury's findings apparently conflict, the court has a duty to harmonize the answers, if it is possible to do so under a fair reading of them." *Ladnier v. Murray*, 769 F.2d 195, 198 (4th Cir. 1985). "If, however, 'viewed in the most generous way, the answers are inconsistent with each other, a new trial is ordinarily required.'" *Id.* (quoting 9 C. Wright & A. Miller, Fed. Practice and Procedure § 2510 (1971)).

"two discrete factual determinations." *Id.* at 214. The Court explained, "the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and *draw the ultimate conclusion of guilt or innocence.*" *Id.* (quoting *United States v. Gaudin*, 515 U.S. 506, 514 (1995)). Although a factually different situation, *Ramirez-Castillo* suggests that a "yes or no" special finding—such as the Special Finding Three—is not the same as a jury's ultimate conclusion that a defendant is "guilty" or "not guilty." This seems particularly true here, where the jury ultimately concluded that Mr. Arevalo was not guilty of even conspiracy or aiding and abetting with respect to Tate's death.

Indeed, allowing the special finding to stand despite the Mr. Arevalo's acquittal of the Tate murder would violate the Sixth Amendment. It is well established that any fact increasing the range of possible punishment must be found by a jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Here, the jury did not believe that Mr. Arevalo's guilt had been proven beyond a reasonable doubt, as demonstrated by their three acquittals. But the jury checked a "yes" box that conflicted with his acquittal. That "yes" increased Mr. Arevalo's maximum punishment without ensuring that the jury understood that they were making a finding beyond a reasonable doubt. As the Fourth Circuit explained in *Ramirez-Castillo*, a yes-or-no answer is not the same as an ultimate determination of guilt. In other words, the use of "yes or no" versus "guilty or not guilty" created an impression that the jury was engaging in an inquiry of lesser importance, rather than ensuring that the jury understood the effect of such a finding. Under these circumstances, there can be no confidence that the jury made Special Finding Three beyond a reasonable doubt, especially given Mr. Arevalo's consistent acquittals on all counts related to Tate's death.

*Third*, the special finding in this case existed to alter the range of punishments, not determine criminal liability. In this case, the Court can easily harmonize the special finding answers without affecting the jury's determination that Mr. Arevalo is guilty of racketeering conspiracy. Striking the special finding would not undo Mr. Arevalo's conviction on Count 1, leaving the jury's determination of guilt unaffected. In other words, this Court can correct this fundamental error in the interest of justice without undoing the jury's ultimate conclusion as to Mr. Arevalo's liability for any count.

In sum, this Court should enter a judgment of acquittal with respect to Special Finding Three of Count 1. There is insufficient evidence in this case to find that Mr. Arevalo "while aiding and abetting others, did willfully, deliberately, maliciously, and with premeditation kill Eric Lanier Tate." Indeed, the jury acquitted Mr. Arevalo of this exact same conduct in three different counts, indicating that the jury agreed the evidence was insufficient. At the same time, this Court should conditionally determine that a new trial is warranted in the event that this judgment of acquittal is reversed. Finally, in the alternative, this Court should grant a new trial on the Special Finding in the interest of justice.

## II. This Court Must Enter a Judgment of Acquittal on Counts 5 and 11.

### a. Facts.

Counts Five and Eleven charged Mr. Arevalo with use of a firearm during a crime of violence causing death. These counts alleged that Mr. Arevalo knowingly and intentionally used, carried, brandished, and discharged a firearm during and in relation to the VICAR murders of Beltran and Mayorga in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j)(1). The government specifically charged an aiding and abetting theory. *See* Doc. 295 at 32. The evidence in support of these charges came solely from Mario Guevara Rivera. But importantly, Guevara's testimony

did not credit Mr. Arevalo with advance knowledge of the firearm. Guevara testified that on the night of the double homicide, Mr. Arevalo and Turcios picked him up from a restaurant. Tr. 1/24/24 at 80. They stopped at an Exxon, where they found Beltran by happenstance. According to Guevara, he has his own firearm with him at the time. There was no testimony that Mr. Arevalo had a gun, that Guevara showed Mr. Arevalo his gun, or that Guevara told Mr. Arevalo about his gun. Guevara testified that while Mr. Arevalo was allegedly retrieving Beltran and Mayorga from the Exxon, Guevara gave Turcios his gun. *Id. at* 80–83. Once Mr. Arevalo allegedly arrived with the victims, Turcios shot Beltran multiple times, including in the face. *Id.* at 84. Turcios then shot Mayorga as he ran away. *Id.* Although Guevara alleged that Mr. Arevalo eventually shot Beltran—after both Turcios and Guevara had shot him multiple times—there was no testimony that Mr. Arevalo knew about the gun before Turcios suddenly shot Beltran in the face.

      b. **Analysis.**

18 U.S.C. § 924(c) prohibits the use or carrying of a firearm "during and in relation to any crime of violence or drug trafficking crime . . . ." Subsection (j) provides the penalty for causing the death of a person through the use of a firearm "in the course of a violation of subsection (c)." By its own terms, subsection (j) thus incorporates subsection (c). To be liable for aiding and abetting a violation of 924(c), however, it is not sufficient that a defendant has aided and abetted a crime of violence of drug trafficking crime in which a firearm was ultimately used. Rather, the defendant must have "advance knowledge" of the firearm with an opportunity to withdraw from the plan. *Rosemond v. United States*, 572 U.S. 65 (2014).

Because § 924 separately penalizes the firearm used in a violent crime or drug trafficking crime, it makes sense that liability under this section requires separate knowledge of the firearm.

8

As the Supreme Court observed,

> When an accomplice knows beforehand of a confederate's design to carry a gun, he can attempt to alter that plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid an *armed* offense. But when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime. And when that is so, the defendant has not shown the requisite intent to assist a crime involving a gun. As even the Government concedes, an unarmed accomplice cannot aid and abet a § 924(c) violation unless he has 'foreknowledge that his confederate will commit the offense with a firearm.' For the reasons just given, we think that means knowledge at a time the accomplice can do something with it—most notably, opt to walk away.

*Id.* at 78.

*Rosemond* also applies to the use of a firearm during a violent crime, including murder. *See United States v. Prado*, 815 F.3d 93 (2d Cir. 2016) (holding that MS-13 members charged with use of a firearm in the commission of racketeering murder were entitled to *Rosemond* instruction).[2] The Fourth Circuit has acknowledged that *Rosemond* applies to violent crimes as well as drug trafficking crimes, consistent with the statutory language. For example, in *United States v. Benson*, the Fourth Circuit considered the sufficiency of the evidence in a case in which the defendants were charged with "aiding and abetting the use of a firearm in a crime of violence resulting in murder, in violation of 18 U.S.C. §§ 924(c)(1) and (j) and 2." 957 F.3d 218, 223 (4th Cir. 2020). The Court specifically analyzed whether there was sufficient evidence that the defendant had advance knowledge of the firearm. *Id.* at 237. The Court did not suggest that this requirement does not exist in cases involving aiding and abetting crimes of violence, including those resulting in death. *See also United States v. Moore*, 843 Fed. App'x 498 (4th Cir. 2021)

---

[2] In *Prado*, the Second Circuit reversed the conviction of one defendant but not of the clique leader. This reversal occurred even though *Rosemond* was decided after the convictions in *Prado*, and thus the Court applied a stringent "modified plain error' rule" used when the "error results from a supervening change in law." *Id.* at 102–03.

("To prove aiding and abetting under § 924(c), the Government must show that the defendant actively participated in the underlying violent crime with *advance knowledge* that 'one of his confederates will carry a gun.'") (quoting *Rosemond*, 572 U.S. at 77); *United States v. Jones*, 761 Fed. App'x 210 (4th Cir. 2019) (same); *United States v. Centeno*, 831 Fed. App'x 666, 667 (4th Cir. 2020) (same).

In this case, there was no evidence that Mr. Arevalo had advance knowledge of Guevara's firearm. Guevara's testimony was that Mr. Arevalo and Turcios picked him up from a bar, and then the men stopped at Exxon. Guevara was in possession of his own gun at the time. There was no evidence that Mr. Arevalo was present when Guevara armed himself, or that Guevara showed Mr. Arevalo his gun or talked to him about the gun in advance. Rather, when Mr. Arevalo arrived at the scene of the homicides, Guevara testified that Turcios shot both victims before handing the gun back to Guevara, who also shot them. This sequence of events does not constitute advance knowledge, let alone knowledge at a time Mr. Arevalo could "opt to walk away." *See Rosemond*, 572 U.S. at 78.

Of course, Mr. Arevalo does not agree that these events transpired. Guevara was an incredible witness upon whom the government's entire case relied, and Mr. Arevalo maintains his innocence of these homicides. But for Rule 29 purposes, the question is whether viewing the evidence "in the light most favorable to the prosecution . . . there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." *White*, 279 F.2d at 748. With respect to these counts, the government failed to present *any* evidence to meet *Rosemond*'s requirement of advance knowledge with an opportunity to withdraw, and thus this Court should enter a judgment of acquittal.

At the same time, this Court should conditionally determine that "a new trial should be

granted if the judgment of acquittal is later vacated or reversed." FED. R. CRIM. P. 29(d)(1). As set forth in Mr. Arevalo's simultaneously filed Motion for a New Trial, a new trial is in the interest of justice because (1) the jury was never instructed on the *Rosemond* requirements and (2) the jury wrestled with the application of aiding and abetting liability to these very charges. Thus, even if a judgment of acquittal were later reversed, it would be inappropriate for the convictions to stand.

### III. This Court Must Enter a Judgment of Acquittal on All Counts and Special Findings Related to the Double Murder.

#### a. Facts.

On June 22, 2019, Milton Beltran Lopez and Jairo Mayorga were found dead in a wooded area in Woodbridge, Virginia. Tr. 1/22/24 at 151–52. Nine cartridge casings were found at the scene. Tr. 1/22/24 at 162. Law enforcement did not attempt to extract DNA from the spent casings, despite new technology that makes this possible. Tr. 1/22/24 at 165; 1/23/24 at 40. Thirteen "fairly new" bottles and cans also were collected from the scene, three of which had latent fingerprints. Tr. 1/22/24 at 166–67. None matched Mr. Arevalo. In fact, there was a stunning lack of forensic evidence for a 2019 homicide: no DNA, no fingerprints, no footwear impressions, no cell site location information, no trace evidence, and no ballistics.

On November 22, 2019, law enforcement searched a Catlett home belonging to Misael Alvarez Puentes. When police entered the home, Abner Molina Rodriguez Molina lunged towards his closet, where a gun was later found. Tr. 1/29/24 at 98, 314–15; Tr. 1/29/24 at 98. Molina was arrested and taken to the police station, where he was interviewed. Tr. 1/29/24 at 182–84; 315. Molina at first denied involvement in the murders. Eventually, however, Molina requested and was provided with his religious pendant. Once he received the pendant, Molina confessed to committing the double murders. *Id.* Molina was charged with these murders in

11

state court, after which he became a government cooperator. *See id.* at 184.

After his arrest and before the government cut him a deal, however, Molina used the jail phone to attempt to get his mother to alibi him for the double murder. *Id.* at 315. Detective Michelle McAllister admitted that Molina "had called his mother on the jail phone in an attempt to get her to alibi him for the double murder," and that he "appeared to be trying to convince his mom to give him an alibi for the double murder . . . ." *Id.* at 315–19. McAllister interviewed and confronted Molina's mother with this fact on December 13, 2019. *Id.* And yet, Case Agent Paul Fisher denied any knowledge of this jail call under oath. *Id.* at 222. Importantly, Mr. Arevalo could not play the actual call for the jury or show them the interpreter's notes since the government had failed to preserve the call or any notes about it.

Molina's involvement in the double murder was also corroborated by other evidence. About one week before trial, undersigned counsel uncovered a *Brady* violation regarding an undisclosed tip that corroborated Molina's involvement. Specifically, a late-disclosed email referred to a "tipster" who "said Abner and Hector Naranjo were bragging about the double in Taco Baja to her." *See* Motion for Specific Relief to Enforce Court's *Brady* Order (Sealed) (Jan. 16, 2024). Undersigned counsel requested information regarding the tip and tipster. On January 16, 2024, the government responded with previously withheld exculpatory information. First, an email from December 2019 documented a call from a tipster who stated that both Abner Molina and a man named Hector Naranjo "admitted to her that they killed the people" in Featherstone (i.e., the double homicide). The email identified the tipster and her phone number. Second, the government had withheld a separate email chain that identified the tipster's email address and in which the tipster identified the victims as Lopez and Mayorga. At trial, the parties stipulated that this tip had occurred. Tr. 1/29/24 at 297. On cross-examination, the key witness—Mario

Guevara Rivera—admitted that "Hector Naranjo" was a false name that both he and Molina had used. Tr. 1/25/24 at 141–42. Agent Fisher testified that he was not aware that Guevara had used this name. Tr. 1/29/24 at 187.

Additionally, prior to trial, the government was in possession of ample evidence that Guevara had told a close friend—Juan Vasquez Reyes—that he had committed the double murder with Molina. In fact, Guevara had told Vasquez Reyes this information the morning after the homicide, when Guevara had brought the firearm he used to the job site where he worked with Vasquez. Detective McAllister admitted that in an interview of Vasquez, he recounted these events and that the double homicide was committed by Guevara and Molina. Tr. 1/30/24 at 10. Shortly thereafter, Agent Fisher also interviewed Vasquez. Tr. 1/29/24 at 194–95. Fisher's report documented Vasquez telling him that "Blue also stated Tecolote [Molina] was present for the homicide" of Beltran and Mayorga. Of course, in his testimony, Fisher claimed that he "was pretty fuzzy on that detail specifically," but admitted that this is what was written in his report. *Id.* at 195. (Due to the government's secret deportation of Vasquez, Mr. Arevalo was unable to call him as a witness. This enabled Guevara to deny telling Vasquez that he had committed the murders with Molina. *See* Tr. 1/25/24 at 55–59.)

Given the lack of forensics, the government relied primarily on Guevara, who claimed to have committed the double murder with Mr. Arevalo and Turcios. Most of Guevara's testimony was implausibly uncorroborated. For example, Guevara testified that Beltran was on a list of people the clique intended to kill. Tr. 1/24/24 at 45–46. He also claimed that Mr. Arevalo had recorded Beltran admitting that he was a Sureño and sent that recording to multiple people. *Id.* at 47; Tr. 1/25/24 at 43–45. But no such list, recording, or messages exchanging the list or recording exist or were introduced at trial. Similarly, Guevara gave a demonstrably false account

13

of how Mr. Arevalo supposedly heard Beltran talking behind the Exxon on Route 1.  *See* Tr. 1/24/24 at 80–81; 94; Tr. 1/25/24 at 41–42; 207–12.

Guevara testified that Mr. Arevalo dropped him and Turcios off at the wooded area where the double homicide ultimately occurred before returning to the Exxon to lure Beltran and Mayorga.  According to Guevara, Mr. Arevalo texted him to say that "there was one other person with him in the car," Mayorga.  *See* Tr. 1/24/24 at 82.  Guevara supposedly responded.  These messages did not exist and were never introduced at trial, despite Guevara's admission that the government had obtained the phone that he was carrying on June 22, 2019.  Tr. 1/25/24 at 45.  The government's own expert on cell phone extractions, Christopher Ford, testified that you can obtain deleted messages during an extraction.  Tr. 1/23/24 at 116.  Even if the deleted messages themselves cannot be located, the extraction will show that items have been deleted.  *Id.* at 117.

Although Mr. Arevalo apparently later approved one of Guevara's stories giving him "credit" for the homicides, this phenomenon was explained by the government's own gang expert, Ricardo Guzman.  Detective Guzman testified that because of the structure of MS-13, gang members take credit for crimes they did not commit.  Taking credit for crimes committed by other people allows a gang member to build reputation and rank up within the gang.  Tr. 1/22/24 at 94–95.  And notwithstanding these stories, Mr. Arevalo retained the same *taka* ("Serio"), while Guevara, Molina, and others changed their names to reflect their increasing ranks.  *See id.* at 92 (Guzman's testimony that a new *taka* is often associated with ranking up to either *chequeo* or homeboy).

In fact, the strongest evidence in this case was the unrebutted proof that Guevara himself was a remorseless, malicious killer who frequently hunted for people to kill—often with Abner Molina Rodriguez.  *See, e.g.*, Tr. 1/24/24 at 144–48 (Guevara describes hunting for random

14

people to kill with Molina); *id.* at 149 (Guevara recounts shooting Antonio Smith in the back and continuing to fire as Smith begged for his life); *id.* at 185–86 (Guevara admits shooting from inside his car five to ten times); Tr. 1/25/24 at 95 (Guevara admits hunting for someone to kill with Molina in New York); *id.* (Guevara admits hunting for someone to kill with Molina in Richmond).

There was also ample reason to believe that Guevara was attempting to pin another one of his murders, that of Eric Tate, on Mr. Arevalo. Crime scene investigator Rebekah Kushner, who responded to both the Tate and Smith scenes, testified to similarities between the two. The scenes—both of which were in apartment complexes right off Route 1—were a few miles apart from each other. Tr. 1/23/24 at 52. Both men were shot in the opening area of an apartment complex while walking alone in the early morning hours. *Id.* at 52–53. Indeed, Guevara admitted that he had gone to the apartment complex where Tate was killed multiple times looking for someone to murder. Every time he went, he was armed. He had even practiced how to leave the area without being seen. Tr. 1/25/24 at 141. Ultimately, the jury rejected Guevara's account of Tate's death, acquitting Mr. Arevalo of that homicide. But the jury convicted Mr. Arevalo of the double homicide after hearing his codefendant's egregious closing argument. *See* Motion for a New Trial (simultaneously filed).

      **b. Analysis.**

Mr. Arevalo was charged and convicted of multiple counts related to the double murder of Beltran and Mayorga: Count Three (conspiracy to murder Beltran in aid of racketeering activity), Count Four (murder of Beltran in aid of racketeering activity), Count Five (use of a firearm during a crime of violence causing the death of Beltran); Count Six (murder of Mayorga in aid of racketeering activity), County Seven (use of a firearm during a crime of violence

15

causing the death or Mayorga), and Count Eight (Witness Tampering). Mr. Arevalo was also convicted of racketeering conspiracy (Count One), and the jury made two special findings that he aided and abetted the murders of Beltran and Mayorga. Each of these convictions and special findings should be set aside as there is not "substantial evidence" supporting them. *See White*, 279 F.2d at 748.

When assessing the sufficiency of the evidence, the Court must look at "the complete picture that the evidence presents." *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996). In this case, although Mr. Arevalo was charged with two homicides occurring in 2019, there was no forensic evidence connecting him to the deaths of Lopez and Mayorga. Casings were collected from the scene, but none were forensically related to a firearm ever possessed by Mr. Arevalo. Similarly, none of the fingerprints found at the scene were connected to Mr. Arevalo. And despite the allegation that Mr. Arevalo had stabbed Mr. Beltran, no knife was found and none of Mr. Arevalo's DNA was present at the scene. Although the jury heard about firearms found in both Guevara and Molina's homes, there was no evidence found in Mr. Arevalo's home. Perhaps more importantly, no cell site location information or messages supported Guevara's story about exchanging texts with Mr. Arevalo as he allegedly lured Beltran and Mayorga from the Exxon.

In addition to the lack of forensic evidence, there was substantial evidence supporting the theory that Guevara had in fact committed these homicides with Molina. Molina, of course, confessed to committing them and was charged with them in state court. Upon arrest, Molina lunged for a firearm in his closet. And after his arrest and confession, Molina called his mother to attempt to fake an alibi for the night of the double homicides. Apparently, both Molina and Guevara also confessed committing the double homicide to a woman who later called in a tip

about their statements. And finally, the day after the homicides, Guevara told Vasquez Reyes that he had committed them with Molina—a fact that the government was able to obfuscate by deporting Vasquez and then disputing the meaningfulness of his consistent account.

In sum, the complete picture of the evidence in this case was that Guevara and Molina had two things in common: being ruthless killers and the government's most important witnesses. To obtain their eventual releases, both men's stories changed over time. At first, Molina was guilty of the double homicide, as recounted to the police, to a tipster, and to Vasquez Reyes. By the time of trial, however, Guevara was blaming Mr. Arevalo. For his part, Molina was barred from testifying due to a *Brady* violation and the Court's finding that he was not a credible witness. Under these circumstances, the evidence of Mr. Arevalo's guilt is far from "substantial," and this Court should enter a judgment of acquittal on all counts and special findings related to the double homicide. At the same time, this Court should make a conditional ruling that a new trial is in the interest of justice, as amply demonstrated in Mr. Arevalo's simultaneously filed Motion for a New Trial.

Respectfully submitted,
CRISTIAN AREVALO ARIAS

s/ Bernadette Donovan

Bernadette M. Donovan
VA BAR 82054
Donovan & Engle, PLLC
1134 East High Street, Unit A
Charlottesville, VA 22902
Office 800-428-5214
Fax 434-465-6866
bernadette@donovanengle.com

Daniel Hutcheson Goldman
VA BAR 82144
The Law Office of Daniel Goldman, PLLC
421 King Street, Suite 505

Alexandria, VA 22314
Office 202-677-5709
Fax 833-523-2310
dan@dangoldmanlaw.com

*Counsel for Cristian Arevalo Arias*

### CERTIFICATE OF SERVICE

I, Bernadette Donovan, Esq., hereby certify that on this February 23, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.  A Notice of Electronic Filing will be served on:

John C. Blanchard
Maureen Cain
Matthew K. Hoff
Assistant United States Attorneys
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Tel: 703-299-3700
Fax: 703-299-3980
John.blanchard@usdoj.gov
Maureen.cain@usdoj.gov
Matthew.hoff2@usdoj.gov

s/ Bernadette M. Donovan