**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| vs. | : | **1:21-CR-260** |
| | : | |
| **CRISTIAN AREVALO ARIAS,** | : | |
| | : | |
| Defendant. | : | **Honorable Leonie M. Brinkema** |
| | : | |

## <u>MOTION FOR A NEW TRIAL</u>

On February 2, 2024, Mr. Arevalo was acquitted of all charges related to the homicide of Eric Tate but convicted of all charges related to the double homicide of Milton Beltran Lopez and Jairo Mayorga.  Mr. Arevalo had presented a vigorous defense, emphasizing that the jury could not trust the testimony of Mario Guevara Rivera ("Blue"), the key witness implicating him in each of the three homicides.  Mr. Arevalo also had collaborated with codefendant Carlos Turcios Villatoro on a critical joint presentation undermining Guevara's testimony about how Mr. Arevalo supposedly lured Beltran from an Exxon gas station.  *After* Mr. Arevalo had offered his closing argument, however, Turcios used his own argument to introduce a new theory of the double homicide.  For the first time, Turcios claimed that Guevara and Mr. Arevalo had lured Beltran and Mayorga from the 7 Market, a theory of Mr. Arevalo's guilt that neither the prosecution nor Turcios had *ever* suggested or attempted to prove.

This Court correctly described Turcios's presentation as "an inappropriate closing argument almost from the beginning."  Transcript ("Tr.") 1/30/24 at 175.  During the argument, Turcios's counsel highlighted the defendants' decisions not to testify, suggesting to the jury that they could consider the fact that Turcios had not testified because *he* did not speak English (unlike Mr. Arevalo, the only English-speaking defendant).  Counsel then proceeded to "tell his

1

story" for him, improperly vouching for a witness who implicated Mr. Arevalo, bolstering that

witness with facts not in evidence, and presenting a novel theory that Mr. Arevalo never had an

opportunity to rebut.  The interest of justice requires that this Court grant Mr. Arevalo a new

trial.  *See* FED. R. CRIM. P. 33(a).

## I.     This Court Must Grant a New Trial Due to Mr. Turcios's Impermissible Closing Argument and its Irreparably Prejudicial Effect.

### a.  Relevant Facts.

On January 6, 2022, Mr. Arevalo and eleven other defendants were charged via

superseding indictment in this racketeering prosecution.  Doc. 27.  Eight of the defendants,

including Mr. Arevalo, were charged with homicides.  At the time, only three of the

defendants—Mr. Arevalo, Guevara, and Turcios—were charged with offenses related to the June

22, 2019, homicides of Beltran and Mayorga ("the double homicide").  Two other defendants—

Melvin Canales Saldana and Manilester Andrade Rivas—were charged with crimes related to the

August 28, 2019, homicide of Eric Tate.  Mr. Arevalo was *not* charged with the Tate homicide,

nor was he ever accused of any involvement in the September 2019 homicide of Antonio Smith.

On June 15, 2023, a second superseding indictment added three charges against Mr.

Arevalo, accusing him of the Tate homicide.  Doc. 295.  Undersigned counsel learned that

Andrade intended to assert that he had been present for Tate's death, but that Mr. Arevalo had

shot Tate in self-defense.  Recognizing that he and Andrade had irreconcilable defenses, Mr.

Arevalo appropriately raised the issue to this Court by promptly filing a motion to sever from

Andrade.  Doc. 349.  Although this Court initially denied Mr. Arevalo's motion, the Court

ultimately severed Mr. Arevalo from Andrade, averting the antagonistic defenses.  Doc. 734.

The Court's severance order split the defendants into two groups.  The first trial (that of

Canales, Andrade, and Jairo Aguilera Sagastizado) concerned the Smith homicide and the

prosecution of Andrade and Canales for the Tate homicide.  The second trial (that of Mr.

Arevalo, Turcios, and Marvin Menjivar Gutiérrez) concerned the double homicide and the

prosecution of Mr. Arevalo for Tate.  The first trial lasted from January 8 to January 18, 2024.

On January 12, 2024, Abner Molina Rodriguez ("Tecolote") testified as a government witness.

*See* Tr. 1/12/24 at 7–170.  Molina admitted that he had confessed to the double homicide but

claimed that the actual perpetrators had been Guevara, Arevalo, and Turcios.  *Id.* at 29–31.

Several days after Molina's testimony, undersigned counsel uncovered a *Brady* violation

regarding an undisclosed tip.  Specifically, a late-disclosed email referred to a "tipster" who

"said Abner and Hector Naranjo were bragging about the double in Taco Baja to her."  *See*

Motion for Specific Relief to Enforce Court's *Brady* Order (Sealed) (Jan. 16, 2024).

Undersigned counsel requested information regarding the tip.  On January 16, the government

responded with previously withheld exculpatory information.  First, an email from December

2019 documented a call from a tipster who stated that both Abner Molina and a man named

Hector Naranjo "admitted to her that they killed the people" in Featherstone (i.e., the double

homicide).  The email identified the tipster and her phone number.  Second, the government had

withheld a separate email chain that identified the tipster's email address and in which the tipster

identified the victims as Lopez and Mayorga.  Mr. Arevalo moved for the dismissal of the

homicide indictments and that the government be barred from calling Molina as a witness.  On

January 17, this Court granted the motion in part, barring the government from calling Molina as

a witness in Mr. Arevalo's trial.  *See* Tr. 1/17/24 at 14–15.

Mr. Arevalo's trial commenced on January 22, 2024.  Guevara was the key witness

against Arevalo regarding all three homicides with which he was charged.  During trial, Guevara

admitted that he was "Hector Naranjo."  With respect to the Tate homicide, Guevara claimed that

he had not participated but had provided Mr. Arevalo with a Sig Sauer Mr. Arevalo supposedly

used to commit the homicide.  Tr. 1/24/24 at 131–36; 1/25/24 at 140.  Guevara testified that this

gun belonged to both him and Aguilera personally.  *Id.*  But firearm examiner Cara McCarthy

testified that gun used in the Tate homicide was "consistent with . . . a Smith & Wesson MMP

series 9-millimeter Luger pistol," not "a SIG Sauer 9-millimeter Luger pistol."  Tr. 1/23/24 at

235, 242–43.  On cross-examination, Guevara originally claimed that he did not remember

owning a Smith & Wesson M&P series 9-millimeter, but when confronted with a picture of one

from his phone, Guevara changed his story and claimed that he had given *that* gun to Mr.

Arevalo.  Tr. 1/24/24 at 146–47.  He also claimed that after the Tate homicide, Mr. Arevalo and

Andrade had given him detailed accounts of the offense.  *Id.* at 137–43.  However, Guevara

admitted that on multiple occasions, *he* had gone to the exact same apartment complex where

Tate was killed looking for someone to murder.  Tr. 1/24/24 at 140–41.

   With respect to the double homicide, Guevara testified that Beltran was on a list of

people the clique intended to kill.  Tr. 1/24/24 at 45–46.  He claimed that Mr. Arevalo had

recorded Beltran admitting that he was a Sureño and sent that recording to multiple people.  *Id.*

at 47; Tr. 1/25/24 at 43–45.  No such list, recording, or messages exchanging the list or recording

exist or were introduced at trial.

   Guevara also testified as to the purported events of June 22, 2019.  Guevara testified that

on that date, he, Mr. Arevalo, and Turcios stopped at the Exxon gas station on Route 1 "across

from La Americana."  Tr. 1/24/24 at 80.  Guevara claimed that Mr. Arevalo entered the gas

station and that while inside, Mr. Arevalo heard Beltran's voice at the dumpster behind the

Exxon.  Guevara claimed that the three men drove off, decided to kill Beltran, and then Mr.

Arevalo returned to the Exxon to get Beltran.  Tr. 1/24/24 at 81.  According to Guevara, Mr.

4

Arevalo texted him to say that "there was one other person with him in the car," Mayorga.  *See id.* at 82.  Guevara supposedly responded.  These messages did not exist and were never introduced at trial, despite Guevara's admission that the government had obtained the phone that he was carrying on June 22, 2019.  Tr. 1/25/24 at 45.  Guevara claimed that Mr. Arevalo then brought Beltran and Mayorga to the wooded area on Featherstone behind the 7 Market.[1]

Notably, Guevara repeatedly testified that Mr. Arevalo had heard Beltran *behind the Exxon*.  This was also the account in one of the written versions of Guevara's story.[2]  *See, e.g.*, Tr. 1/24/24 at 94 ("And then they went by the Exxon to get some gas.  At that moment . . . Serio realized that behind the gas station, there were people."); Tr. 1/25/24 at 41–42 (Guevara agrees that he just happened to find Beltran "outside a busy gas station . . . located right on Route 1, a very high frequency street");[3] *id.* at 42 (Guevara testifies that "[t]here were no video cameras behind the gas station"); *id.* at 207 (Guevara agrees that Beltran was found "at the Exxon [s]tation across from the La Americana grocery store," which was on a "fairly busy part of Route 1" with lots of stores, cars, and noise); *id.* at 209 (Guevara confirms that the Exxon at which this allegedly occurred is right across from the Americana grocery store); *id.* at 211 (Guevara claims that Beltran "was in the back").

Guevara was consistent that Beltran was near the trash area behind the Exxon when Mr. Arevalo allegedly heard his voice.  In fact, counsel for Turcios emphasized this point, including

---

[1] In 2019, the convenience store located in front of the gas station was named the "7 Market." During trial, it was variously referred to as the 7 Market, the "1 Mart," or "7 Mart."  All such references refer to what has since been renamed the "1 Stop Market," a convenience store located at 1551 Featherstone Road, Woodbridge, VA 22191. The bodies of Lopez and Mayorga were found in a wooded area behind this convenience store.

[2] To be clear, no story claimed that the men had encountered Beltran somewhere other than the Exxon.  Rather, other versions of the story did not name a location.  *See* Tr. 1/24/24 at 94—105.

[3] The 7 Market/1 Stop Market is located on Featherstone Road, a quieter side street.

the following exchange:

> Q     And my understanding is, your testimony is that when Serio comes back to the car through the front door, he tells you that he heard voices from all the way behind the gas station; is that fair?
>
> A     Yes.  He communicated that to us.
>
> Q     And he, according to you, he not only heard voices, but he was able to recognize Milton's voice; is that your testimony?
>
> A     That's right.
>
> Q     Now, this convenience store, it faces Route 1, it's a solid building all the way across; correct?
>
> A     No.  the part of the gas station is just that little store and the gas station.
>
> Q     Okay.  But the gas station itself—the convenience store—and what you're testifying to is that Serio, after being in the store for about two minutes, heard voices coming from behind the convenience store, in the woods behind the convenience store, and was able to recognize one of them as Milton's?  Is that your testimony?
>
> A     We're not talking about a big gas station; it was a small station.  And what he heard were voices behind the gas station by the trashcans.

*Id.* at 207–12.  Importantly, Guevara testified that it was only after they had decided to kill Beltran that Mr. Arevalo dropped him and Turcios off at the "Seven Mart" and then returned to the Exxon to pick up Beltran.  *Id.* at 215.

This aspect of Guevara's testimony was important because it would be immediately apparent to anyone who had been to the Exxon that this account was provably false.  Thus, after Guevara completed his testimony on January 26 (a Friday), counsel for Arevalo (Bernadette Donovan) and counsel for Turcios (Christopher Amolsch) coordinated with both of their investigators to test that hypothesis over the weekend.  This experiment was Turcios's idea, and it was Turcios who called both investigators as witnesses during his defense case.  However, as

discussed below, the coordination between the two teams was also evident to the jury, as was the importance of this issue to Mr. Arevalo's defense.

Turcios first called Thomas Buckley, a former police officer and his own private investigator. Tr. 1/29/24 at 272. Buckley testified to his observations of the Exxon across from La Americana on Route 1. Turcios admitted multiple photographs of the Exxon to demonstrate the impossibility of Guevara's story. Throughout Buckley's testimony, it was undersigned counsel—not Turcios's other lawyer—who ran Turcios's electronic exhibit display from her own laptop, which she carried from counsel table to the area directly behind the podium for this purpose. *See id.* at 274 ("With the assistance of Ms. Donovan, I'm going to take you through some of those photos . . . ."). The photographs showed that a high wooden fence split the area behind the Exxon from the front of the store. *Id.* at 274–78; Def. Ex. 165-8 through 13. They also showed that a beverage cooler runs along most of the windowless back wall of the Exxon. *Id.* at 278–80; Def. Ex. 165-15 through 165-17. Finally, the photos showed the trash area behind the Exxon, which is about sixty feet behind the store. Tr. 1/29/24 at 281–83; Def. Ex. 165-19 & 165-20. The upshot was that it would have been impossible for Mr. Arevalo to have heard Beltran at the trash area behind the gas station, eviscerating Guevara's testimony about how Beltran was found and lured by Mr. Arevalo on the day of his death.

Buckley then testified about how the two defense teams had collaborated to test whether someone standing by the trash area behind the Exxon could be heard from the store. Buckley testified that it was impossible to hear a voice, let alone whose voice it was. Tr. 1/29/24 at 283–86. Turcios next called Philip Becnel, Mr. Arevalo's investigator, to testify about the same experiment. Becnel testified that he and undersigned counsel had stayed by the dumpster while Buckley and Turcios's attorney waited inside the Exxon. Undersigned counsel and Becnel had

sung the Star-Spangled Banner in "a loud singing voice," and then "screaming at the top of my lungs." *Id.* at 294–95.

Certain that the teams shared a theory—just as they had shared the investigation and presentation of this critical evidence—counsel for Mr. Arevalo discussed it in closing:

> [Guevara] wants you to believe that one day he goes out and just happens to run into Beltran Lopez at the most highly trafficked street in Woodbridge, Route 1, at a gas station, a highly public location, and, despite all this planning, just decides to take him from there. He told you specifically that Cristian went into this gas station store, and that when he came out, he said that from inside the store, he had heard Beltran Lopez talking from the dumpster behind the store. This makes absolutely no sense. It made so little sense that we went out over the weekend to test it. And you heard testimony about that, too.

> Mr. Becnel and I stood next to this dumpster. Mr. Amolsch and Investigator Buckley stood inside. And as you heard the investigators testify to, we sang the National Anthem. They couldn't hear us. So as you heard Mr. Becnel testify to, we then sang it at the top of our lungs, and still nothing. It's just not possible. It's not possible. It's a story that Blue [Guevara] invented so he could find a way to include Cristian in his crime.

Tr. 1/30/24 at 107–08.

That afternoon, counsel for Turcios also delivered a closing argument that surprised everyone by undoing this collaboration and introducing a novel theory of Mr. Arevalo's guilt. At the outset, counsel Van Pelt suggested to the jury that they "might wonder, like, why didn't [Turcios] tell his story?" *Id.* at 136. Counsel then asserted that it was because Turcios "has a grade-school education in El Salvador" and "doesn't speak this language." *Id.* at 136. Counsel asserted that "the decision that we came to as Carlos's lawyer with his input, is that it's best to let me speak for Carlos . . . to tell his story." *Id.* at 137.

Counsel then displayed a single page that combined photographs of Karen Figueroa and

Walter Rubio Lemus from separate exhibits.[4]  Counsel proceeded to vouch for Figueroa, introducing for the first time the theory that Mr. Arevalo was guilty, but Turcios was not:

> These two people, I suggest to you, they told you the truth. How do we know that?  Karen Figueroa.  Her tears on cross-examination, *that was real pain to me*.  She told you about that conversation when her husband got a call on speakerphone from Blue, and she overheard Blue tell her how he had just committed the double murder *with Serio*.  Imagine your husband getting that call . . . . that is a conversation that you remember.  That's something that's seared in your memory.  I suggest to you that she probably was telling the truth, and she probably got it right.

*Id.* at 138 (emphasis added).  Having introduced a new theory in which Guevara committed the double murder with Mr. Arevalo but not Turcios, counsel immediately turned to undoing the defense teams' joint presentation that debunked Guevara's testimony about the Exxon: "*And [Karen Figueroa] said that she heard Blue say that they lured him behind the One Mart with drugs.  There wasn't a conversation about the Exxon* or about driving away and coming up with a plan."  *Id.*

> Counsel later returned to and expanded upon this theory:

> *So Blue testified pretty clearly that Serio got out of the car and went into the convenience store and that he heard voices*, and, in particular, he heard the voice of Milton Beltran Lopez at the dumpster, the trashcan behind the convenience store.  Okay.  We know that didn't happen.

> Here's what I suggest happened.  Blue was driving around that night with someone else, maybe Tecolote.  There's a lot of evidence of that.  It's a Friday night, they're out at the clubs, they're selling cocaine, they're doing cocaine, something Carlos wasn't involved with; right?  *They stop at the Seven Mart, not at the Exxon, at the Seven Mart.  My printer is dying, so this is a horrible photo.  This is not the one in evidence, you can look at the one in evidence.  And I can't talk while I'm back there, but I'm going to go back there, and I'm going to point out the dumpster.*

---

[4] All images used in Turcios's closing argument were hard copies displayed through the overhead projector system to multiple screens throughout the courtroom.  The defense teams did not have access to a printer at the courthouse, indicating that these images had been prepared in advance of the day's proceedings—including in advance of Mr. Arevalo's closing argument.

*Id.* at 141–42 (emphasis added).  Counsel then turned from the podium to the overhead projector, on which she was displaying a low-quality printed copy of USA Exhibit 1-1A, which is an overhead photograph of the 1 Stop Market taken in 2023.  Counsel next pointed to an area behind the 1 Stop Market where she was claimed there was a dumpster.  (At no point in trial had there been *any* evidence introduced regarding a dumpster or trash area behind the 7 Market convenience store, let alone as it existed in 2019.)

Counsel for Turcios then claimed that "Blue and whoever was with him" lured and murdered Beltran and Mayorga.  She added that "perhaps Carlos then walked to the Exxon— that's why the Exxon is in the story—and they picked him up after."  *Id.* at 142.  (Again, there was no evidence regarding Turcios walking to the Exxon that night.)  Counsel then repeatedly claimed that Guevara had committed the crime with Mr. Arevalo, not Turcios.  *Id.* at 142–43 ("There's really nothing to corroborate Blue's story when it comes to Carlos.  Nothing; right?  There's no messages.  Blue didn't send this story to Carlos."); *id.* at 143 ("You have him telling Karen Figueroa that he did it with Serio."); *id.* at 148 ("He told Karen he did it with someone else, Serio.").  Finally, Ms. Van Pelt's last sentence to the jury was: "*Please remember Karen Figueroa*, and please take care of [Turcios]."  *Id.* at 150 (emphasis added).

At the conclusion of closing arguments, undersigned counsel objected, asked for a mistrial, and moved to be severed from Turcios.  *Id.* at 160–66.  Undersigned counsel cited counsel's comments on Turcios's decision not to testify, which were designed to contrast with Mr. Arevalo's English-speaking abilities.[5]  Undersigned counsel also cited Turcios's mutually

---

[5] Mr. Arevalo was the only defendant who did not wear a headset to hear live interpretation.  The government also had admitted evidence of two controlled buys in which Mr. Arevalo spoke English.  *See* Tr. 1/26/24 at 198–204; USA Exhibit 51-3B (video of controlled buy in which Mr. Arevalo speaks English to Detective Michelle McAllister); USA Ex. 51-4/Defense Ex. 96

antagonistic defense, which had been sprung on Mr. Arevalo when he would have no opportunity to respond to the novel allegation that he had lured Beltran and Mayorga from the 7 Market.  *Id.*

After excusing the jury, the Court agreed that it "was also quite surprised" by Turcios's closing argument, which was the first time Turcios had indicated he was pursuing an inconsistent and antagonistic defense.  The Court also noted that a previous severance had been granted in the case.  *Id.* at 162–63.  Additionally, the Court agreed that Turcios's "closing argument went way beyond the bounds of appropriate conduct."  *Id.* at 168.  The Court suggested that it was possible "that just the case against [Turcios] goes to the jury and the other two defendants have to stand trial again.  That's the line that I think would most likely cure the problem that's been raised . . . ."  *Id.* at 170.  Due to the gravity of the issue, the Court gave the parties a recess to consider their positions and possible remedies.  The Court stated that its "initial thinking is to sever out the case such that only the . . . case against Turcios go to . . . the jury, and the other two defendants would have to stand trial again, unless something is worked out."  *Id.* at 171.

The parties recessed.  When they returned, the Court ruled that in consideration of judicial resources, it would deny the motion to sever and instruct the jury to disregard Turcios's closing argument.  The Court cited Turcios's improper vouching and the fact that the "argument did not focus solely on the evidence presented during the trial."  *Id.* at 173.  The Court noted, however, that "this certainly makes the case vulnerable down the road . . . but there are always other post-trial ways in which that can be resolved . . . ."  *Id.* at 174.  The Court also described Turcios's closing as "an inappropriate closing argument almost from the beginning, citing, among other things, counsel's references to "things that were simply not in the record."  *Id.* at

---

(transcript in which Mr. Arevalo speaks English); USA Ex. 52-3C1 (video of second controlled buy in which Mr. Arevalo speaks English to Detective McAllister).

175.  Mr. Arevalo thanked the Court for the cautionary instruction but maintained that a mistrial and severance were the appropriate remedies.  *Id.* at 175–76.

The jury deliberated for almost three days before returning a verdict on the afternoon of February 2, 2024.  The jury acquitted Mr. Arevalo of all charges relating to the murder of Eric Tate (Counts 9, 10, and 11).  Notably, Turcios had not been charged in the Tate murder, nor had his highly prejudicial closing argument discussed Tate's death.  But the jury convicted Mr. Arevalo of all charges relating to the double murder of Milton Beltran Lopez and Jairo Mayorga. In other words, Mr. Arevalo was convicted of the murders about which Turcios had introduced a last-minute, highly prejudicial theory that Mr. Arevalo had no opportunity to rebut.

### b.  Analysis.

#### i.  Applicable Standards.

Rule 33(a) empowers this Court to "vacate any judgment and grant a new trial if the interest of justice so requires."  "By its terms, Rule 33 confers broad discretion on a district court."  *United States v. Prescott*, 221 F.3d 686, 688 (4th Cir. 2000).  When assessing a new trial motion, "the interest of justice is the touchstone for consideration."  *United States v. Mitchell*, 602 F.2d 636, 639 (4th Cir. 1979) (citing FED. R. CRIM. P. 33; 2 WRIGHT, FEDERAL PRACTICE & PROCEDURES: CRIMINAL § 557, at 515–16 & n.97 (1969)).  Rule 33's "plain meaning makes unmistakably clear that granting a new trial is discretionary, and the cases reflect that this discretion should be exercised where it is demonstrated that the fundamental fairness or integrity of the trial result is substantially in doubt."  *United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006), *aff'd*, 496 F.3d 344 (4th Cir. 2007).  When assessing a Rule 33 motion, "the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government."  *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985);

*see also United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992).

"[C]ourts have 'widely agreed that Rule 33's interest of justice standard allows the grant of a new trial where substantial legal error has occurred.'" *United States v. Smithers*, No. 1:17-cr-27, 2019 WL 3456625, at *2 (W.D. Va. 2019) (quoting *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010)).  Moreover, "[a]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Benkhala*, No. 1:06-cr-9, 2007 WL 9752818, at *2 (E.D. Va. 2007) (quoting WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 556 (3d ed. 2004)); *see also Smithers*, 2019 WL 3456625, at *2.

"A jury verdict may also be overturned 'when substantial prejudice has occurred.'" *United States v. Gengler*, No. 1:08-cr-12, 2009 WL 5549225, at *20 (E.D. Va. Oct. 23, 2009) (quoting *United States v. Jones*, 542 F.2D 186, 211 (4th Cir. 1976)).  "If prejudicial evidence that was not introduced at trial comes before the jury, the defendant is entitled to a new trial." *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir. 1984) (citing *Paz v. United States*, 462 F.2d 740 (5th Cir.), *cert. denied*, 414 U.S. 820 (1972)); *see also United States v. Nance*, 828 F.2d 18 (1987) (per curiam) ("We are not prepared to say that the improperly admitted evidence in the case did not contribute to the jury's verdict.  Certainly, we find no abuse of discretion in the district court's decision to the contrary."). "The general standard for determining if the evidence is prejudicial is whether there is a reasonable probability that the jury's verdict was influenced by material that improperly came before it." *Barnes*, 747 F.2d at 250.  Prejudice is presumed.  *Id.*; *see also Gengler*, 2009 WL 5549225, at *20 (applying *Barnes* standard to new trial motion).

"There is ample authority that 'the interests of justice' standard is met where a new trial is based on the . . . exertion of improper influence on the jury." *Jennings*, 438 F. Supp. 2d at 641 (citing *United States v. Bruscino*, 662 F.2d 450 (7th Cir. 1981)).  In *Bruscino*, for example, the

Court discussed the need for "a stringent test" when external facts not in evidence are presented to the jury.  "A stringent test is needed because jury consideration of facts not introduced in evidence denies a defendant's Sixth Amendment rights to confrontation, cross-examination, and assistance of counsel with respect to the extraneous evidence." *Bruscino*, 662 F.2d at 458.  This is particularly important "during the trial of a defendant charged with a particularly shocking crime." *Id.* (quoting *United States v. Dressler*, 112 F.2d 972, 981 (7th Cir. 1940)).

In sum, this Court has broad discretion to grant a new trial when that would be in the interest of justice.  Moreover, the interest of justice calls for a new trial when an error has called the fundamental fairness or integrity of a proceeding into doubt.  The fairness of a trial may be harmed by not only legal error, but also the introduction of prejudicial external evidence or material that has an improper influence.  In such cases, a defendant's most fundamental Sixth Amendment rights—confrontation, cross-examination, and the assistance of counsel—are all undermined.  In other words, a new trial is necessary when a defendant's trial is infected by external information that his counsel had no opportunity to confront or argue against.

### ii.  A New Trial is in the Interest of Justice.

Mr. Arevalo had a fundamental right to confront the witnesses and allegations against him.  Throughout his trial, he availed himself of this right, cross-examining the government's witnesses and calling its theory of prosecution into doubt.  Ultimately, the jury did not fully accept the government's case against Mr. Arevalo, nor did it fully credit the testimony of Mario Guevara Rivera.  In fact, the jury acquitted Mr. Arevalo of all charges related to the murder of Eric Tate, implicitly rejecting Guevara's testimony about the events surrounding that homicide.  And yet, the jury convicted Mr. Arevalo of every charge related to the double homicide.  Ultimately, the one aspect of this case Mr. Arevalo could not answer was Turcios's closing

14

argument, which was designed to hamstring his defense by depriving him of an opportunity to defend himself.  Turcios's inappropriate closing severely prejudiced Mr. Arevalo in multiple ways, the cumulative effect of which requires a new trial.

Turcios's closing argument created a perfect storm of constitutional violations.  In a single argument, Turcios (1) revealed a mutually antagonistic defense at the final moment of trial, (2) improperly vouched for and bolstered the witness who would most support his antagonistic defense, (3) introduced facts not in evidence that he intended to be damning to Mr. Arevalo, and (4) violated Mr. Arevalo's Fifth Amendment rights by improperly commenting on his own decision not to testify in a manner designed to contrast with Mr. Arevalo's decision.  Although it is the cumulative effect of this argument that made it so irreparable, it is worth mentioning each prejudicial aspect of Turcios's problematic closing.

*First*, Turcios waited until closing argument to introduce a mutually antagonistic defense.  Simply put, Mr. Arevalo should not have been required to defend himself against a codefendant.

> The burden of overcoming any individual defendant's presumption of innocence, by proving guilt beyond a reasonable doubt, rests solely on the shoulders of the prosecutor.  Joinder is problematic in cases involving mutually antagonistic defendants because it may operate to reduce the burden on the prosecutor, in two general ways.  First, joinder may introduce what is in effect a second prosecutor into a case, by turning each codefendant into the other's most forceful adversary. Second, joinder may invite a jury confronted with two defendants, at least one of whom is almost certainly guilty, to convict the defendant who appears the more guilty of the two regardless of whether the prosecutor has proven guilt beyond a reasonable doubt as to that particular defendant.

*Zafiro v. United States*, 596 U.S. 534, 539 (1993) (Stevens, J., concurring).  For that reason, severance is appropriate when "acceptance of one defendant's defense will lead the jury to convict the other."  *United States v. Serpoosh*, 919 F.2d 835, 838 (2d Cir. 1990); *see also United States v. Andrews*, No. 1:12-cr-100, 2013 WL 6230450, at *6 (N.D.W. Va. Nov. 26, 2013) (discussing the *Zafiro* concurrence and concluding that "the mutually antagonistic defenses in

this case will thrust defense counsel into the role of prosecutor, thereby reducing the government's burden."); *see also United States v. Odom*, 888 F.2d 1014 (4th Cir. 1989) (upholding mid-trial severance after one codefendant decided to prosecute the other). That was certainly the case here, where the jury's acceptance of Turcios's theory—that Guevara and Mr. Arevalo lured Beltran and Mayorga from the 7 Market—would necessarily lead them to convict Mr. Arevalo.

In this case, Turcios's mutually antagonistic defense was particularly prejudicial because of the way he conducted it and the timing of its reveal. During his opening statement, Turcios made no suggestion that he was blaming Mr. Arevalo. Throughout trial, Mr. Arevalo questioned witnesses first, and Turcios went last, intentionally hiding his ultimate strategy. Indeed, Turcios did not even question Karen Figueroa, despite his intention to make her the key witness in his side prosecution of Mr. Arevalo. *See* Tr. 1/29/24 at 63. Turcios even worked with Mr. Arevalo's defense team to investigate and present evidence that Guevara could not be telling the truth about Mr. Arevalo hearing and luring Beltran from the Exxon. But in closing argument, Turcios suddenly revealed his true theory: Mr. Arevalo had heard Beltran behind the 7 Market and lured him from there with Guevara, only meeting up with Turcios after the homicides. *See* Tr. 1/30/24 at 138, 141–43, 148, 150.

Holding this new prosecutorial theory until the end of the case was a calculated decision intended to deprive Mr. Arevalo of any opportunity to confront it. Having already rested his case and given a closing argument, Mr. Arevalo could not investigate Turcios's theory, cross-examine witnesses about it (such as Turcios's own alibi witness), rebut it with his own evidence, or argue against it to the jury. The effect was the Mr. Arevalo was subjected to not only a "second prosecutor," but also one against whom he had no constitutional protections nor opportunity to

respond.  As the Court correctly noted, this was a surprising decision, especially given the prior severance that had been granted in this case.

*Second*, Turcios supported his mutually antagonistic defense by improperly vouching for Karen Figueroa, whom he made the key witness in his side prosecution of Mr. Arevalo. Displaying a pre-prepared photograph of Figueroa, Turcios described her testimony as "the truth" and discussed how "[h]er tears on cross-examination, that was real pain to me."  Tr. 1/30/24 at 138 (emphasis added).  (Notably, this was a reference to Mr. Arevalo's cross-examination of Figueroa, during which she had begun crying.)  Turcios then recounted how Figueroa "overheard Blue tell her how he had just committed the double murder with Serio," and how her account had not included the Exxon at all.  *Id.*  ("I suggest to you that she probably was telling the truth, and she probably got it right.  And she said that she heard Blue say that they lured him behind the One Mart with drugs.  There wasn't a conversation about the Exxon or about driving away and coming up with a plan.").  Having improperly vouched for Figueroa, Turcios continued to repeatedly refer to her testimony implicating Mr. Arevalo.  *See id.* at 143 ("You have him telling Karen Figueroa that he did it with Serio."); *id.* at 148 ("He told Karen he did it with someone else, Serio.").  Finally, Ms. Van Pelt's last sentence to the jury was: "*Please remember Karen Figueroa*, and please take care of [Turcios]."  *Id.* at 150 (emphasis added).

Of course, it is improper for lawyers to state "a personal belief in the credibility or honesty of a witness . . . ."  *See United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997); *see also United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993) ("It is error for the Government to bolster or vouch for its own witnesses.  Vouching generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness.").  In this case, Turcios's emotional closing argument

emphasized counsel's supposed personal belief that Figueroa was telling the truth.

In addition to vouching for Figueroa, Turcios impermissibly bolstered her testimony by suggesting that it was corroborated by evidence known to counsel but not the jury. *See Sanchez*, 118 F.3d at 198 ("[B]olstering is an implication by the government that the testimony of a witness is corroborated by evidence known to the government but not known to the jury."). In this case, Turcios suggested that Figueroa's testimony was corroborated by three pieces of evidence unknown to the jury: (1) the layout of the 7 Market and its trash area in 2019, (2) the content of what Turcios's testimony would have been, had he not been a Spanish speaker and thus unable to testify, and (3) counsel's background information from collaborating with Mr. Arevalo's team. These independent issues, discussed in more detail below, had the effect of bolstering a witness for whom counsel already had vouched.

*Third*, and relatedly, Turcios introduced facts not in evidence to support the theory that Mr. Arevalo and Guevara had committed the double homicide without Turcios. Most significantly, Turcios displayed a grainy copy of USA Exhibit 1-1A, which was an overheard photograph of the 1 Stop Market taken in 2023. (The government had used this exhibit as an aid to demonstrate the travel routes around the wooded area where Beltran and Lopez were found in 2019, when the space had been occupied by the 7 Market.) Turcios described Guevara's testimony that Mr. Arevalo "got out of the car and went into the convenience store and that he heard voices, and, in particular, he heard the voice of Milton Beltran Lopez at the dumpster, the trashcan behind the convenience store." Tr. 1/30/24 at 141. Turcios acknowledged that this could not have happened at the Exxon. Turcios then claimed,

> They stop at the Seven Mart, not at the Exxon, at the Seven Mart. My printer is dying, so this is a horrible photo. This is not the one in evidence, you can look at the one in evidence. And I can't talk while I'm back there, but I'm going to go back there, and I'm going to point out the dumpster.

*Id.* at 141–42.

Counsel indicated an area behind the 7 Market that was proximate to the convenience store itself, unlike the dumpster behind the Exxon, which was an estimated sixty feet from the convenience store.  In the grainy photo, it was unclear whether there was a dumpster behind the 7 Market where counsel indicated.  But the point, of course, was to tell the jury that there *was* a dumpster behind the 7 Market in 2019, at the time of the murders, despite a lack of any evidence about the fact.  Through this presentation, counsel both (1) introduced prejudicial facts not in evidence against Mr. Arevalo and (2) bolstered Figueroa's testimony through those "facts."  *See id.* at 138 (noting that Figueroa "said that she heard Blue say that they lured him behind the One Mart with drugs.  There wasn't a conversation about the Exxon").  As counsel well knew—but the jury did not—the exhibit did not show the 7 Market in 2019; it showed the successor 1 Stop Market in 2023.

*Fourth*, counsel engaged in an inappropriate discussion of Turcios's decision not to testify that was designed to prejudice Mr. Arevalo by both bolstering Figueroa's testimony and improperly contrasting his decision with that of Mr. Arevalo.  Counsel began by suggesting that the jury "might wonder, like, why didn't [Turcios] tell his story?"  *Id.* at 136.  Counsel then asserted that it was because Turcios "has a grade-school education in El Salvador" and "doesn't speak this language."  *Id.* at 136.  Counsel asserted that "the decision that we came to as Carlos's lawyer with his input, is that it's best to let me speak for Carlos . . . to tell his story."  *Id.* at 137.

In the context of this case and the argument as a whole, there were two highly prejudicial aspects of counsel's assertions.  One was the obvious implication that Turcios had told his story to counsel, who was now telling "his story" to the jury.  And Turcios's story, as subsequently

recounted by counsel, was that Guevara and Mr. Arevalo had lured Beltran and Mayorga from the 7 Market, killed him, and then picked Turcios up at the Exxon afterwards. This was an account of the events of June 22, 2019, that had never been introduced into evidence. Just like counsel's discussion of the purported dumpster behind the 7 Market in 2019, one of the main reasons Turcios introduced these facts not in evidence was to bolster Figueroa. *See id.* at 138 (noting that Figueroa "said that she heard Blue say that they lured him behind the One Mart with drugs. There wasn't a conversation about the Exxon").

A second deeply prejudicial aspect of counsel's argument was that it suggested to the jury that it could consider the reasons a defendant chose not to testify. More specifically, it was designed to suggest that Turcios had a good reason, but Mr. Arevalo did not. Turcios was careful to explain that he had a sufficient reason, which was his educational level and the fact that he did not speak English. But it was apparent to the jury that Mr. Arevalo had no such excuse. Mr. Arevalo is a fluent English speaker. In this case, Mr. Arevalo was the only defendant who did not wear a headset to hear live interpretation. Although Mr. Arevalo was not visible from all areas of the jury box, he was visible from much of the box, and the jurors did not maintain the same seating arrangement daily. But perhaps more notably, the whole jury had *seen* Mr. Arevalo speak English, since the government admitted evidence of two controlled buys in which he did so. *See* Tr. 126/24 at 198–204; USA Exhibit 51-3B (video of controlled buy in which Mr. Arevalo speaks English to Detective Michelle McAllister); USA Ex. 51-4/Defense Ex. 96 (transcript in which Mr. Arevalo speaks English); USA Ex. 52-3C1 (video of second controlled buy in which Mr. Arevalo speaks English to Detective McAllister).

In fact, Turcios pointed out that in this case there were "professional witnesses, police officers on the stand who were made to look a little silly at times"—a not-so-veiled reference to

Mr. Arevalo's cross-examination of Detective Michelle McAllister.  The obvious implication of Turcios's comments on his decision not to testify—especially in the context of his closing argument as a whole—was that he had good reason not to take the stand and tell his story about how Mr. Arevalo committed the double homicide without him, but Mr. Arevalo had no reason other than guilt to remain silent.  This is exactly the type of inference that cannot be drawn from a decision not to testify, and exactly why the impermissibility of such argument is bedrock constitutional law.  *See Wilson v. United States*, 149 U.S. 60 (1893); *Griffin v. California*, 380 U.S. 609 (1965); *Chapman v. California*, 386 U.S. 18 (1967); *Fontaine v. California*, 390 U.S. 593 (1968); *cf Gengler*, 2009 WL 5549225, at *24 (granting a new trial and suggesting that the jury might have considered the decision of one of the defendants not to testify).

       In sum, Turcios should have moved to sever from Mr. Arevalo.  Instead, he waited until Mr. Arevalo was defenseless to introduce a new theory of his guilt.  The introduction of a mutually antagonistic defense at a time calculated to deprive Mr. Arevalo of an opportunity to respond was irreparably prejudicial.  But Turcios did not just force Mr. Arevalo to face a second prosecutor after he had already closed.  Rather, Turcios's closing argument prejudiced Mr. Arevalo on numerous additional levels.  Through a combination of improper vouching, bolstering, introducing facts not in evidence, and commentary on the invocation of the defendants' decisions not to testify, Turcios created a perfect storm of errors that could not be overcome.  For that reason, even after the Court proposed a curative instruction, Mr. Arevalo renewed his requests for a mistrial and severance from Turcios.

       Not all prejudice can be remedied by a curative instruction.  "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the

jury system cannot be ignored."  *Bruton v. United States*, 391 U.S. 123, 135 (1968); *see also*

*Jackson v. Denno*, 378 U.S. 368, 388–89 (1964) (holding that procedure in which jury is

instructed to disregard a confession if they find it involuntary is unconstitutional because the jury

might "unconsciously" rely on the confession); *Marshall v. United States*, 360 U.S. 310 (1959)

(holding that jury exposure to newspaper articles merited mistrial even though jurors attested that

they would not consider the prejudicial information); *Throckmorton v. Holt*, 180 U.S. 552, 567

(1901) ("But yet there may be instances where such a strong impression has been made upon the

minds of the jury by illegal and improper testimony, that its subsequent withdrawal will not

remove the effect caused by its admission"); *United States v. Rinaldi*, 301 F.2d 576, 578 (2d Cir.

1962) ("Improper introduction of evidence of a defendant's past criminal record is ground for a

new trial.  Cautionary instructions will not cure the error."); *United States v. Colombo*, 909 F.2d

711, 715 (2d Cir. 1990) (finding "presumption that the jury was able to follow the court's

limiting instruction has been negated" where the improperly admitted evidence "demolished his

defense."); *United States v. Garcia*, 752 F.3d 382, 384 (4th Cir. 2014) (concluding that

cautionary instructions did not "adequately mitigate[] the risk of substantial prejudice.").

In this case, a cautionary instruction could not adequately mitigate the risk of substantial

prejudice to Mr. Arevalo.  As a starting point, severance was required because of the mutually

antagonistic defense Turcios planned against Mr. Arevalo.  Had Turcios articulated his defense

prior to trial, a severance would have been clearly warranted, as Turcios both planned to act as a

second prosecutor and planned to offer a defense that required Mr. Arevalo's conviction.

Although unfortunate, severance was no less necessary simply because Turcios decided to lie in

wait and present his defense at the last moment.  On the contrary, the timing of Turcios's

antagonistic defense made it *more* prejudicial, not less, for at least four reasons.

One, the timing robbed Mr. Arevalo of any opportunity to defend himself against the sudden allegation that he and Guevara had lured Beltran from the 7 Market, a theory no one had ever annunciated until that moment.  Second, Turcios purposefully presented this allegation *after* the two defense teams had made a joint presentation debunking Guevara's testimony about the Exxon.  This created the *false* impression that counsel for Turcios had inside knowledge from working with Mr. Arevalo that the jury did not, i.e., that Mr. Arevalo and Guevara had lured Beltran from the 7 Market.  Indeed, Turcios's counsel crafted his closing argument with that in mind, professing to tell Turcios's "story" to the jury since he could not.  Three, Turcios effectively undid one of the pillars of Mr. Arevalo's defense: that Guevara's testimony about the events of the double homicide was provably false, as demonstrated by the defense teams' joint presentation regarding the Exxon.  This was not only the subject of a joint presentation, but also a critical topic in Mr. Arevalo's closing argument.  However, Mr. Arevalo had no opportunity to rebut Turcios's case against him.  Four, the highly emotional tenor of the argument was designed to leave a lasting impression, not one that would dissipate quickly or be readily cured.  *See* Tr. 1/30/24 at 175 (noting that Turcios's closing "was way too emotional for federal court as well.").

In short, Mr. Arevalo was entitled to a separate trial from Turcios.  Although deeply disappointing, the sunk costs of an improperly joined trial do not outweigh Mr. Arevalo's right to have his culpability determined by a jury that is unaffected by a second prosecutor in defense clothing.  When mutually antagonistic defenses rise to this level, severance is the remedy, not a cautionary instruction.  This is no less true simply because the need for severance is a surprise.  On the contrary, had Mr. Arevalo known that Turcios was presenting an antagonistic theory, he could have and would have investigated and defended himself against that same theory.  Of course, the whole reason the defense argues after the prosecution is to answer the issues raised

by the government.  In this case, Mr. Arevalo effectively faced a prosecutor he never had a chance to answer.  The deprivation of an opportunity for Mr. Arevalo to do so could not be remedied by instruction.

Of course, the prejudice in this case was not limited to the presentation of an antagonistic defense.  Turcios's antagonistic defense was also supported almost entirely by improper argument.  Turcios's argument in favor of his "Arevalo did it" defense had four crucial parts, all of which were improper.  First, counsel vouched for Karen Figueroa, a witness who claimed to have heard Guevara say he committed the double homicide with Mr. Arevalo.  Counsel then repeatedly returned to her, ending by imploring the jury to "please remember Karen Figueroa." Second, counsel improperly bolstered Figueroa's testimony by presenting facts not in evidence about the existence of a dumpster behind the 7 Market in 2019 and by implying that counsel knew facts the jury did not.  Third, and relatedly, counsel improperly relied on facts not in evidence by arguing the layout of the 7 Market in 2019, when there was no proof about the appearance or trash area of that convenience store during the relevant time and claiming that Turcios met Mr. Arevalo at Exxon later.  Fourth, counsel suggested to the jury that they should consider *why* a defendant did not testify, emphasizing that a defendant with a language barrier had a good reason not to testify.  This argument both implied that Mr. Arevalo lacked a good reason not to testify, and suggested to the jury that this was an appropriate consideration.  All of this, of course, was in the context of counsel's emotional telling of Turcios's "story," which was that Mr. Arevalo was guilty and he was not.

In conclusion, Turcios's sudden presentation of a mutually antagonistic defense through a closing argument riddled with constitutional issues was an unfortunate event.  Mr. Arevalo took no pleasure in moving for a mistrial and severance, but there was no other remedy sufficient to

cure the prejudice of Turcios's closing.  In his own defense and closing, Mr. Arevalo had emphasized the impossibility of Guevara's story about the Exxon, making this a crucial fact in the case.  It is thus unrealistic to believe that the jury could fully set aside the idea that Mr. Arevalo had lured from the 7 Market.  That prejudice was cemented when Turcios added bolstering, vouching, and commentary on the Fifth Amendment right to remain silent to the mix.  Mr. Arevalo is entitled to a new trial without Turcios.

## II.  This Court Must Grant a New Trial on the 924(j) Charges Due to the Denial of a *Rosemond* Instruction.

### a.  Relevant Facts.

Mr. Arevalo was charged with three counts of use of a firearm during a crime of violence causing death.  *See* Doc. 295 (Counts Five, Seven, and Eleven).  Mr. Arevalo was acquitted of Count 11, which related to the use of a firearm during the Tate homicide.  Mr. Arevalo was convicted, however, of the two counts stemming from the homicides of Beltran (Count Five) and Mayorga (Count Eleven).  These counts alleged that Mr. Arevalo knowingly and intentionally used, carried, brandished, and discharged a firearm during and in relation to the VICAR murders of Beltran and Mayorga in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j)(1).  The government specifically charged an aiding and abetting theory.  *See* Doc. 295 at 32.

Jury Instruction 57 informed the jury of the nature of these offenses.  Instruction 59 provided the "essential elements of the offense," including that "[t]he defendant knowingly and intentionally used and carried, or aided and abetted the use and carrying of, a firearm during and in relation to the crime of violence."  During deliberations, the jury sent the following question:

> In Jury Instruction Number 57, Count 5, it states: "Did knowingly <u>and </u>intentionally use, carry . . ." (p. 66)
>
> This seems to contridict [sic] Jury Instruction #59, where it states "the defendant knowingly and intentionally used and carried, <u>or</u> aided and abetted." (p. 69)

> For the "and" and the "or" conditions, we would like some clarification or if there is a priority.

Tr. 1/31/24 at 16.  Mr. Arevalo requested that the jury be given a *Rosemond* instruction

consistent with the one that counsel for Menjivar had submitted.  *See* Tr. 1/31/24 at 11, 13, 24;

Tr. 2/2/24 at 5–6; *see also* Doc. 887-1 at 6 (Menjivar's proposed *Rosemond* instruction).  The

Court denied the request.

    **b.  Analysis.**

    18 U.S.C. § 924(c) prohibits the use or carrying of a firearm "during and in relation to

any crime of violence or drug trafficking crime . . . ."  Subsection (j) provides the penalty for

causing the death of a person through the use of a firearm "in the course of a violation of

subsection (c)."  By its own terms, subsection (j) thus incorporates subsection (c).  To be liable

for aiding and abetting a violation of 924(c), however, it is not sufficient that a defendant has

aided and abetted a crime of violence of drug trafficking crime in which a firearm was ultimately

used.  Rather, the defendant must have "advance knowledge" of the firearm with an opportunity

to withdraw from the plan.  *Rosemond v. United States*, 572 U.S. 65 (2014).

    Because § 924 separately penalizes the firearm used in a violent crime or drug trafficking

crime, it makes sense that liability under this section requires separate knowledge of the firearm.

As the Supreme Court observed,

> When an accomplice knows beforehand of a confederate's design to carry a gun, he can attempt to alter that plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid an *armed* offense.  But when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime.  And when that is so, the defendant has not shown the requisite intent to assist a crime involving a gun.  As even the Government concedes, an unarmed accomplice cannot aid and abet a § 924(c) violation unless he has 'foreknowledge that his confederate will commit the offense with a firearm.'  For the reasons just

given, we think that means knowledge at a time the accomplice can do something
with it—most notably, opt to walk away.

*Id.* at 78.

*Rosemond* also applies to the use of a firearm during a violent crime, including murder.
*See United States v. Prado*, 815 F.3d 93 (2d Cir. 2016) (holding that MS-13 members charged
with use of a firearm in the commission of racketeering murder were entitled to *Rosemond*
instruction).[6]   The Fourth Circuit has acknowledged that *Rosemond* applies to violent crimes as
well as drug trafficking crimes, consistent with the statutory language.  For example, in *United
States v. Benson*, the Fourth Circuit considered the sufficiency of the evidence in a case in which
the defendants were charged with "aiding and abetting the use of a firearm in a crime of violence
resulting in murder, in violation of 18 U.S.C. §§ 924(c)(1) and (j) and 2."  957 F.3d 218, 223 (4th
Cir. 2020).  The Court specifically analyzed whether there was sufficient evidence that the
defendant had advance knowledge of the firearm.  *Id.* at 237.  The Court did not suggest that this
requirement does not exist in cases involving aiding and abetting crimes of violence, including
those resulting in death.  *See also United States v. Moore*, 843 Fed. App'x 498 (4th Cir. 2021)
("To prove aiding and abetting under § 924(c), the Government must show that the defendant
actively participated in the underlying violent crime with *advance knowledge* that 'one of his
confederates will carry a gun.'") (quoting *Rosemond*, 572 U.S. at 77); *United States v. Jones*, 761
Fed. App'x 210 (4th Cir. 2019) (same); *United States v. Centeno*, 831 Fed. App'x 666, 667 (4th
Cir. 2020) (same).

Under the facts of this case, the denial of a *Rosemond* instruction matters.  As a starting

---

[6] In *Prado*, the Second Circuit reversed the conviction of one defendant but not of the clique
leader.  This reversal occurred even though *Rosemond* was decided after the convictions in
*Prado*, and thus the Court applied a stringent "modified plain error' rule" used when the "error
results from a supervening change in law."  *Id.* at 102–03.

point, there is no way to know exactly what the jury believed Mr. Arevalo's role was in the double homicide.  The jury certainly did not accept Guevara's testimony as whole, as indicated by the Tate acquittal, so there is no reason to believe that they accepted all his testimony about the double homicide.  But even still, Guevara's testimony did not credit Mr. Arevalo with advance knowledge of the firearm.  Guevara testified that on the night of the double homicide, Mr. Arevalo and Turcios picked him up from a restaurant.  Tr. 1/24/24 at 80.  They stopped at an Exxon, as detailed *supra* Claim I.  Guevara testified that he had his own firearm with him.  Guevara did not testify, however, that he told Mr. Arevalo about the gun or showed it to him.  There was no allegation that Mr. Arevalo had a gun.  In the woods—while Mr. Arevalo was allegedly at the Exxon—Turcios asked Guevara for his gun so he could shoot first.  *Id. at* 80–83.  Once Mr. Arevalo allegedly arrived with the victims, Turcios shot Beltran multiple times, including in the face.  *Id.* at 84.  Turcios then shot Mayorga as he ran away.  *Id.*  Although Guevara alleged that Mr. Arevalo eventually shot Beltran—after both Turcios and Guevara had shot him multiple times—there was no testimony that Mr. Arevalo knew about the gun before Turcios suddenly shot Beltran in the face.  And of course, there is no way to know if the jury believed that Mr. Arevalo personally shot Beltran.

The jury's note provides additional reason to believe that a *Rosemond* instruction mattered.  The jury was concerned about aiding and abetting liability, indicating that this was the theory under which they were considering the defendants' guilt.  The jury underlined the requirement that a defendant "knowingly <u>and </u>intentionally" use a firearm, then explicitly contrasted that requirement with the instruction providing aiding and abetting as an alternate avenue of liability.  The jury also wanted "clarification" or "a priority" between the conjunctive and disjunctive, signaling that they were unsure of the mental state necessary for 924 liability.

Given that the jury was struggling with the relationship between knowledge, intent, and aiding and abetting in this context, it cannot be concluded that the jury believed Mr. Arevalo shot Beltran.  The jury simply had no way to know that an aider and abettor is only liable with advance knowledge and an opportunity to withdraw.

As instructed, the jury could have convicted Mr. Arevalo of the double homicide and attendant firearm charges so long as they believed that he knew the crime was going to be committed, knowingly did an act to aid or abet that crime, and acted with the intention of causing that crime.  For example, the jury could have believed that Mr. Arevalo knowingly lured Beltran from the 7 Market without any specific knowledge of Guevara's firearm, which is an insufficient basis for 924(c) and (j) liability under *Rosemond*.  Because the jury was not adequately instructed on an element of 924 liability, these counts must be vacated and a new trial ordered.  *Cf. United States v. Norton*, 17 Fed. App'x 98 (4th Cir. 2001) (jury instruction that understated elements of racketeering liability warranted reversal); *United States v. Mitchell*, 495 F.2d 285 (4th Cir. 1974) (denial of important jury instruction warranted new trial).

## CONCLUSION

Rule 33 exists to correct errors that affect the fundamental fairness or integrity of the proceedings.  In this case, the fundamental fairness of Mr. Arevalo's trial was irreparably undone when Turcios dedicated his closing argument to a novel, mutually antagonistic theory of Mr. Arevalo's guilt.  Any doubt about the harm caused was answered by the unusual combination of vouching, bolstering, reliance on facts not in evidence, and commentary on the defendants' silence employed in Turcios's emotional close.  Sometimes, a bell can't be unrung.  This is one of those times.  The interest of justice requires a new trial for Mr. Arevalo.

Respectfully submitted,

CRISTIAN AREVALO ARIAS

s/ Bernadette Donovan

Bernadette M. Donovan
VA BAR 82054
Donovan & Engle, PLLC
1134 East High Street, Unit A
Charlottesville, VA 22902
Office 800-428-5214
Fax 434-465-6866
bernadette@donovanengle.com

Daniel Hutcheson Goldman
VA BAR 82144
The Law Office of Daniel Goldman, PLLC
421 King Street, Suite 505
Alexandria, VA 22314
Office 202-677-5709
Fax 833-523-2310
dan@dangoldmanlaw.com

***Counsel for Cristian Arevalo Arias***

## CERTIFICATE OF SERVICE

I, Bernadette Donovan, Esq., hereby certify that on this February 23, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.  A Notice of Electronic Filing will be served on:

John C. Blanchard
Maureen Cain
Matthew K. Hoff
Assistant United States Attorneys
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Tel: 703-299-3700
Fax: 703-299-3980
John.blanchard@usdoj.gov
Maureen.cain@usdoj.gov
Matthew.hoff2@usdoj.gov

s/ Bernadette M. Donovan