IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARVIN MENJIVAR GUTIERREZ,<br>a/k/a "Astuto,"<br><br>*Defendant.* | No. 1:21-cr-260-LMB-2<br><br>Hon. Leonie M. Brinkema<br><br>Sentencing Date: June 4, 2024 |

## THE UNITED STATES' POSITION ON SENTENCING

The United States of America, through undersigned counsel and in accordance with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual (the "Guidelines" or "U.S.S.G."), hereby provides its position paper with respect to the sentencing of the defendant, Marvin Menjivar Gutierrez. The defendant comes before the Court for sentencing having been convicted at trial of five counts[1] in connection with drug trafficking and the murder of Milton Beltran Lopez ("Milton"). The crimes were perpetrated by the defendant and other members of the *Sitios Locos Salvatrucha* ("STLS") clique of *La Mara Salvatrucha*, or MS-13.

The United States has reviewed the Presentence Investigation Report (the "PSR"), which correctly calculates the total offense level to be 43 and the defendant's criminal history category to be I, and concurs with the findings of the Probation Office, including that the defendant must be sentenced to life imprisonment by statute for being convicted of Murder in Aid of Racketeering Activity. The United States respectfully asks that the Court impose sentences of life imprisonment for Counts One and Four, a twenty-year sentence for Count Two, and a ten-year sentence for Count

---

[1] The government has previously moved to dismiss Count Five without prejudice prior to the defendant's sentencing to avoid any potential Double Jeopardy issues. *See* ECF 1009.

1

Three, all to run concurrently with one another, for a total sentence of life imprisonment. Such sentences accord with the Sentencing Guidelines, the 18 U.S.C. § 3553(a) factors, and the relevant statutory provisions. These sentences would also bring some measure of justice to Milton and his family.

I.  **FACTUAL BACKGROUND AND PROCEDRUAL HISTORY**

The evidence presented at trial showed that the defendant and his co-conspirators were members of MS-13's STLS clique. The enterprise to which the defendant belonged was fueled by the illicit proceeds of regular cocaine sales that began in 2016 after STLS received seed money from gang leadership in El Salvador. Tr. at 204 (1/9/24). The evidence at trial proved that the defendant was the gang's source of supply, and that gang members regularly traveled to New York so that he could provide them with cocaine to sell in Northern Virginia.

STLS had a hierarchical structure based upon its members' ranks within MS-13, and the defendant was the "First Word," or leader, of STLS in the United States. STLS' rules generally required members who held the rank of *observación* to commit a murder to graduate to the rank of *chequeo*, and a member was typically required to commit multiple murders before being "jumped in" as a "homeboy" (i.e., a full-fledged member). Tr. at 272-73 (1/23/24). As the STLS leader, the defendant, whose co-conspirators referred to him as "Astuto" and "A1," had the final say when it came to the gang's activities. *Id.* at 273; Tr. at 171-72 (1/24/24); Gov't Ex. 26-10A at 9-10. Melvin Canales Saldana ("Canales"), who was known as "Demente" or "D1," was the defendant's second-in-command. *Id.* at 273 (1/23/24).

The evidence established that in early 2019, the defendant and Canales ordered the STLS *observaciones* to commit a murder within three months so that they could rise in rank within MS-13. *Id.* at 289-90. This order sprang from Canales' belief that STLS members in the United States

2

needed to do more than sell narcotics and should start killing like their counterparts in El Salvador so that STLS could establish more turf. *Id.* at 290. Canales obtained concurrence from gang leadership in El Salvador and, at a gang meeting, the defendant and Canales gave the *observaciones* a three-month deadline to start committing murders. *Id.* at 289-90. The defendant and Canales were supposed to approve murders proposed by the *observaciones*, though when specific individuals whose murders had been authorized to kill could not be located, members would hunt for rival gang members or drug dealers to kill at random. *Id.* at 291-92.

Evidence forensically extracted from cell phones corroborated the testimony of Mario Guevara Rivera, a/k/a "Blue" ("Guevara"), concerning the facts discussed above. In late March 2019, the defendant told Guevara via WhatsApp that the defendant was trying to figure things out because he needed to move Guevara and others up in the gang. Tr. at 18, 20 (1/24/24); Gov't Ex. 25-13A. In that same exchange, Guevara told the defendant that Canales and others apparently identified people they wanted murdered, and the defendant told Guevara that they had a list for that purpose and it was about finding an opportunity to commit murders. Tr. at 18, 20-24 (1/24/24); Gov't Ex. 25-13A. The defendant also told Guevara that they were just waiting for the opportunity to kill. Tr. at 25-26 (1/24/24); Gov't Ex. 25-13A. Notes dated May 12, 2019 taken by Manilester Andrade Rivas ("Andrade") during a clique meeting reflected that members had two and half months left to commit a murder. Tr. at 75 (1/24/24); Tr. at 42-44 (1/29/24); Gov't Exs. 23-28A, 23-28C2.

After the defendant and Canales told the *observaciones* to kill, Cristian Arevalo Arias ("Arevalo") proposed Milton as a target because Milton had previously informed Arevalo and members of MS-13's *Pinos Locos* clique that he was a rival gang member looking to grow his gang in Woodbridge. Tr. at 44-46 (1/24/24). The defendant told Arevalo and the other gang

members to investigate Milton to confirm his rival gang membership. *Id.* at 46. After Arevalo sent the defendant a recording of Milton professing himself to be a rival gang member, the defendant sought permission to kill Milton from gang leadership in El Salvador. *Id.* After STLS leadership approved his request, the defendant informed his underlings that they could kill Milton. *Id.* at 47.

After Guevara, Arevalo, and Carlos Turcios Villatoro ("Turcios") murdered Milton and Jairo Mayorga ("Jairo"), Guevara informed the defendant and Canales. *Id.* at 88. The defendant and Guevara then discussed whether Guevara would be credited with two murders, and the defendant told Guevara that was the defendant's decision to make and that he would need to think about it because only one of the victims (Milton) was a confirmed *chavala* (rival gang member). Tr. at 120-122 (1/24/24); Gov't Ex. 26-9A. A mere week after Guevara, Arevalo, and Turcios murdered Milton and Jairo, the defendant told Guevara that he needed Guevara to put pressure on people to obtain firearms so that the gang could commit another murder. Tr. at 124-125 (1/24/24); Gov't Ex. 26-11A. The defendant told Guevara that they had to "go all in" and that the defendant was going to promote Guevara and others after they committed an additional murder in the three months that followed. Tr. at 125-126 (1/24/24); Gov't Ex. 26-11A. The defendant also told Guevara he wanted Andrade and Jairo Aguilera Sagastizado ("Aguilera") to move up in three months' time, to which Guevara responded by claiming there were plenty of "chickens" or "hens" (i.e., victims) in the area for whenever Aguilera came down from New York. Tr. at 51, 126-127 (1/24/24); Gov't Ex. 26-11A. STLS members and associates, including Aguilera, would go on to murder two more men within the next three months.

## II.  SENTENCING GUIDELINES

Though the Guidelines are advisory, sentencing courts must consult the Guidelines and take them into account when sentencing a defendant. *United States v. Booker*, 543 U.S. 220, 261

4

(2005). Thus, at sentencing, a court must first calculate the Guidelines range applicable to the defendant's case. *Nelson v. United States*, 555 U.S. 350, 351 (2009). The United States, the defendant, and the Probation Office agree that the calculation of the appropriate offense level for the defendant is as follows:

| | |
|---|---|
| **Count Group 1 - Base Offense Level** | |
| VICAR Murder: (§§ 2E1.3(a)(2) and 2A1.1(a)) | **43** |
| Organizer / Leader Adjustment (§ 3B1.1(a)) | **+4** |
| **Count Group 2 - Base Offense Level** | |
| Conspiracy to Distribute Cocaine (§ 2D1.1(a)(5)(c)(8)) | **24** |
| Organizer / Leader Adjustment (§ 3B1.1(a)) | **+4** |
| **Multiple Count Adjustment** | |
| Total Number of Units from Count Groups – Combined Adjusted Offense Level (§ 3D1.4) | **1 (47)** |
| **Adjusted Offense Level** | **43** |
| Pursuant to Chapter 5, Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43. | |

### III.   § 3553(a) FACTORS

In considering an appropriate sentence, a district court examines both the Sentencing Guidelines and the statutory factors established under 18 U.S.C. § 3553(a). *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). To determine a sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *Id*. "Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *Id*.

Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

The Guidelines, for example, encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an Offense Level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the offense), as well as reflect "the history and characteristics of the defendant" (most notably by establishing a Criminal History Category based on the defendant's prior criminal record). 18 U.S.C. § 3553(a)(1). The Guidelines further help to prevent "unwarranted sentencing disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they are sentenced. 18 U.S.C. § 3553(a)(6). Based on those factors, a sentence of life imprisonment for the defendant is appropriate and reasonable to achieve the purposes of sentencing in this case.

### A. Nature, Circumstances, and Seriousness of the Offense (§§ 3553(a)(1) & (a)(2)(A))

After the defendant ordered mid-level STLS members to begin killing in the Spring of 2019, the Washington, D.C. metropolitan area became an MS-13 hunting ground. The defendant did not pull any triggers himself. Safe in New York, he commanded younger men to kill people in Northern Virginia simply so that they could rise in rank and eventually help his clique establish turf of its own. Unlike most murders, the slayings committed in the wake of the defendant's order were not motivated by anger, greed, lust, envy, fear, intoxication, or revenge. Mothers lost their sons and children lost their fathers so that men could become more respected by other murderers and gang members.

The defendant marked a man for death whom he had never met with the aim of increasing STLS' prestige. After Milton and Jairo were murdered, the defendant made it clear that he wanted his underlings to shed more blood and become homeboys. Not even the death of Antonio Smith in September 2019, which brought STLS' tally to four dead victims in three months, was enough to satisfy the defendant. *See* Gov't Ex. 23-78A, 23-78C2 (October 2, 2019 Meeting Notes: "Each one of the *chequeos* has two months to prepare a well-explained and detailed report regarding who to play with and how to proceed. Once it's done, it needs to be sent to A1 by December 1, 2019; he will decide if play will be allowed or not."). The defendant deserves a life sentence, as that is the only appropriate sentence in this case to reflect the nature, circumstances, and seriousness of his conduct.

### B. History and Characteristics of the Defendant (§ 3553(a)(1))

The defendant left El Salvador in 2009 and subsequently came to the United States. He was raised by both of his parents in a home where his parents provided for him. PSR at ¶ 131. Despite this, the defendant came to the United States and became the leader of a violent criminal street gang who supplied his subordinates with cocaine to sell. The defendant has no prior criminal history.

### C. The Need to Promote Respect for the Law and the Need to Afford Adequate Deterrence to Criminal Conduct (§§ 3553(a)(2)(A) and (B))

In constructing the defendant's sentence, the Court should take into account the seriousness of the defendant's conduct, the need to promote respect for the law, and the need to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). Certainly, the seriousness of the defendant's conduct is self-evident, and the need to promote respect for the law is readily apparent. The need to afford adequate deterrence to criminal conduct as to both the defendant, as well as others involved in similar crimes, calls for a life sentence. 18 U.S.C. § 3553(a)(2)(B).

A life sentence notifies members of the community that even if one does not pull the trigger himself, aiding and abetting the murder of another and participating in the illicit activities of violent criminal gangs will be punished accordingly. As this Court knows, MS-13 still maintains a significant presence throughout the Eastern District of Virginia and the United States. This defendant was the leader of the STLS clique in this country, and it was under his direction that four men lost their lives. By sentencing the defendant to life in prison, the Court will send a message to the defendant that this conduct will not be tolerated, and will make it clear to other members of MS-13 and other gangs that participation in acts of gang violence simply will not be tolerated in this District. A life sentence will also protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(C). A life sentence in this case will specifically deter the defendant from committing further violations of law and will send an unambiguous message to other gang leaders that those who order and/or commit crimes to further a gang's interests in the Eastern District of Virginia will pay dearly. Therefore, a sentence of life imprisonment in necessary to satisfy the requirements of 18 U.S.C. § 3553(a).

### D. Restitution

Pursuant to 18 U.S.C. § 3663A and the provisions of the Mandatory Victim Restitution Act of 1996, the defendant should be held jointly and severally liable for payment of restitution to the family of Milton Beltran. The United States respectfully requests that the Court order restitution in the amount of $8,00 for funeral and burial expenses.

### E. Need for a Term of Supervised Release

Ordinarily, a court should not impose a term of supervised release in a case, like this one, in which supervised release is not required by statute and the defendant is a deportable alien. U.S.S.G. § 5D1.1, application note 5. However, a court should consider imposing a term of

supervised release on such a defendant if it determines that doing so "would provide an added measure of deterrence and protection based on the facts and circumstances of the particular case." *Id.* Given that the defendant engaged in drug dealing and murder, and was the leader of a racketeering enterprise, such an added measure of deterrence and protection is needed and can be achieved by imposing a term of supervised release. Therefore, the United States also recommends a five-year term of supervised release in this case.

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully asks that the Court impose sentences of life imprisonment for Counts One and Four (which requires a mandatory life sentence), a twenty-year sentence for Count Two (which requires a mandatory 5-year sentence), and a 10-year sentence for Count Three, all to run concurrently with one another, for a total sentence of life imprisonment. The government also recommends that the Court impose a five-year term of supervised release for Counts One, Two, and Four, and a three-year term of supervised release for Count Three, all to run concurrently with one another, which the defendant shall serve should he ever be released from the custody of the Bureau of Prisons and return to the United States. These sentences are sufficient, but not great than necessary, to achieve the purposes of federal sentencing.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: May 28, 2024      By: */s/ John Blanchard*
John C. Blanchard
Assistant United States Attorney

Matthew K. Hoff
Deputy Chief
Violent Crime and Racketeering Section

9

## CERTIFICATE OF SERVICE

I certify that on May 28, 2024, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause a true and accurate copy of this document to be transmitted to counsel of record.

I further certify that on May 28, 2024, I emailed a copy of the foregoing to the U.S. Probation Officer assigned to this matter:

Jennifer Lyerly
United States Probation Officer
Eastern District of Virginia
Email: Jennifer_Lyerly@vaep.uscourts.gov

By: */s/ John Blanchard*
John C. Blanchard
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3999
Fax: (703) 299-3980
John.Blanchard@usdoj.gov